# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARTIN HOVENKOTTER,<br><br>   Plaintiff,<br><br>  vs.<br><br>SAFECO INSURANCE COMPANY OF<br>ILLINOIS,<br><br>   Defendant. | CASE NO. 2:09-cv-00218-JLR<br><br>**DECLARATION OF TIFFANY L.<br>POWERS IN SUPPORT OF<br>DEFENDANT'S RESPONSE TO<br>PLAINTIFF'S MOTION FOR CLASS<br>CERTIFICATION** |

I, Tiffany L. Powers, declare and state as follows:

  1.  I am an attorney admitted to practice law in Georgia, Virginia, and the District of Columbia, and a partner of the law firm of Alston & Bird LLP, counsel for Defendant Safeco Insurance Company of Illinois ("Safeco"). This declaration is filed in support of Defendant's Response to Plaintiff's Motion for Class Certification. I have personal and firsthand knowledge of the facts stated in this declaration. If called upon to do so, I could and would testify competently thereto.

  2.  Attached hereto as Exhibit 1 is a true and correct copy of pertinent portions of the deposition of Plaintiff Martin L. Hovenkotter, taken on November 13, 2009, in Bellevue, Washington.

  3.  Attached hereto as Exhibit 2 is a true and correct copy of pertinent portions of the deposition of Safeco Employee Scott Kohl, taken on December 15, in Clayton, Missouri.

  4.  Attached hereto as Exhibit 3 is a true and correct copy of the Expert Report prepared by Stephen D. Prowse, Ph.D, CFA pursuant to Fed. R. Civ. P. 26(a)(2).

  5.  Attached hereto as Exhibit 4 is a true and correct copy of pertinent portions of the deposition of Safeco Employee Toby Rollins taken on January 14, 2010 in Seattle, Washington.

  6.  Attached hereto as Exhibit 5 is a true and correct copy of pertinent portions of the

deposition of Michael G. Stave, taken on November 12, 2009, in Seattle, Washington.

      7.     Attached hereto as Exhibit 6 is a true and correct copy of Hovnkotter0067, a check sent from Safeco to Martin L. Hovenkotter in the amount of $200.00 for the difference in value between his collision deductible and UMPD deductible.

      8.     Attached hereto as Exhibit 7 is a true and correct copy of pertinent portions of the deposition of Michael Carroll, taken on February 19, 2010, in Irvine, California.

      9.     Attached hereto as Exhibit 8, pursuant FED. R. EVID. 1006, is a chart containing true and correct excerpts from various specimen policy forms issued by Safeco during the putative class period and produced to Plaintiff as Bates Numbers SICI 00000285 through SICI 00005805 on October 23, 2009.  The policy forms from which the excerpts are derived are publicly filed documents that were filed with the applicable state Departments of Insurance. Additionally, approximately 35 of these policy forms are included as Exhibit B to the affidavit of Michael Carroll.

      I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

      Executed this 23 day of April, 2010, at Atlanta, GA.

                                         Respectfully submitted,

                                         Tiffany L. Powers

- 2 -

# EXHIBIT A-1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE WESTERN DISTRICT OF WASHINGTON

AT TACOMA

MARTIN HOVENKOTTER,                )
                                   )   No. 2:09-cv-00218-JLR
            Plaintiff,             )
                                   )
      vs.                          )
                                   )
SAFECO Corporation, SAFECO         )
Insurance Company of America,      )
and SAFECO Insurance Company       )
of Illinois,                       )
                                   )
            Defendants.            )

DEPOSITION UPON ORAL EXAMINATION OF
MARTIN HOVENKOTTER
10:00 a.m.
November 13, 2009
Bellevue, Washington

Taken Before:

Laura A. Gjuka, CCR #2057
Certified Shorthand Reporter

Page 2

```
 1                    A P P E A R A N C E S

 2    For the Plaintiff:       STEPHEN M. HANSEN
                               Lowenberg, Lopez & Hansen
 3                             950 Pacific Avenue
                               Suite 400, Commerce Building
 4                             Tacoma, WA 98402-4441
                               253-383-1964
 5                             LLHlaw@aol.com

 6
      For the Defendant:       CARI K. DAWSON
 7                             Alston & Bird
                               One Atlantic Center
 8                             1201 West Peachtree Street
                               Atlanta, GA 30309-3424
 9                             404-881-7000
                               cari.dawson@alston.com
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              BE IT REMEMBERED that on the 13th of November,

 2    2009, 10:00 a.m., at 1400 112th Avenue, Bellevue,

 3    Washington, before LAURA A. GJUKA, CCR# 2057, Notary

 4    Public in and for the State of Washington, appeared

 5    MARTIN HOVENKOTTER, the witness herein;

 6              WHEREUPON, the following proceedings were had

 7    and done, to wit:

 8                        * * * * * *

 9    MARTIN HOVENKOTTER, having been first duly sworn by

10                      the Notary, deposed as follows:

11

12                        EXAMINATION

13    BY MS. DAWSON:

14 Q  Mr. Hovenkotter, we just met.  My name is Cari Dawson

15    and I represent the defendant, Safeco Insurance Company

16    of Illinois.  Have you ever been deposed before?

17 A  No.

18 Q  All right.  To explain to you, I will ask a series of

19    questions today.  And you are under oath as evidenced by

20    the swearing in by the court reporter.  It is important

21    that you listen carefully to my questions and that you

22    answer them.  If you don't ask me to clarify or reask a

23    question, I am going to assume that you understand what

24    I am asking when you respond.

25 A  Okay.
```

1 Q  And that would have been in --

2 A  '98.

3 Q  1998.  The other thing you need to do is let me finish

4     my questions so it is clear on the --

5 A  I am sorry, you are right.  I am sorry.

6                    MS. DAWSON:  No problem.

7                    MR. HANSEN:  It is an easy mistake to

8     make.

9  BY MS. DAWSON:

10 Q  So back sometime -- let's say, '97 or '98, what was your

11    understanding of the term "diminished value"?

12 A  I guess I just knew the two words "diminished" and

13    "value" at that time.  I didn't know them as an

14    automobile phrase until sometime later, I think.

15 Q  When did you learn -- let me ask you this:  What do you

16    understand the term "diminished value" to mean?

17 A  Now?  I think the term represents a value that is the

18    difference between what a vehicle is worth without

19    physical damage to it and then after -- what the vehicle

20    is worth after it has been physically damaged and

21    repaired as well as humanly possible.

22 Q  When did you come to that understanding of the meaning

23    of diminished value?

24 A  Probably within the last year.

25                    MR. HANSEN:  Counsel, I know you are

```
 1    it may fit others' facts and situations.  And if it

 2    does, they might be in a class of people that would

 3    benefit from a presentation of what happened to me,

 4    information about what happened to me.

 5 Q  What claims are you asserting on behalf of the class?

 6 A  A diminished value claim for some amount of the value of

 7    the Mazda, Mazda Speed 6, which was of -- worth less

 8    value after the repair than it was before.

 9              MR. HANSEN:  And only -- objecting only to

10    the extent that the complaint speaks for itself.

11    BY MS. DAWSON:

12 Q  Do you know who David Futscher is?

13 A  I don't.

14 Q  Do you know who Van Bunch is?

15 A  Van Bunch?  No, I don't.

16 Q  Do you know who Patricia Syverson is?

17 A  I don't.

18 Q  Do you know who Elaine Ryan is?

19 A  I don't.

20 Q  Do you know who Charles Hunter is?

21 A  No.

22 Q  Do you know who Debra Hayes is?

23 A  She is an attorney that's been on some of the paperwork

24    we submitted, and I believe Juven Cano works for her,

25    submitted things to her.
```

1  Q   What type of relief do you want in filing this lawsuit?

2          MR. HANSEN:  Same objection.  Go ahead and

3      answer if you can.

4          THE WITNESS:  Okay.  Some financial risk

5      for the production -- some financial benefit from the

6      reduced value.

7  BY MS. DAWSON:

8  Q   Do you want what you perceive to be the diminished value

9      of your Mazda paid to you?

10 A   Right.

11 Q   And what do you want on behalf of the class?

12 A   That they would be treated the same.

13 Q   So you would like the class to be paid any dimunition in

14     value of their vehicles by Safeco; is that correct?

15 A   Uh-huh.

16 Q   You need to say yes or no.

17 A   Oh, I am sorry, yes.

18 Q   Any other relief you want for yourself or on behalf of

19     the class in filing this class action lawsuit?

20          MR. HANSEN:  Same objection.

21          THE WITNESS:  My only thought is if there

22     is some compensation to -- to allow me to pay for my gas

23     to come down here and that kind of thing, to cover some

24     of my expenses.

25

Page 25

```
 1    where my normal cars sit.  And the third is my stall,
 2    and it is all fixed up with tools and detailing supplies
 3    to polish out cars and prep them, those kinds of things.
 4 Q  So when you describe tools, these are tools to kind of
 5    enhance the appearance of the car?
 6 A  Straight mechanical tools, as well as lots of -- I have
 7    equal amounts of straight mechanical tools, screw
 8    drivers, wrenches, that kind of thing, and I have an
 9    equal amount of buffers and lotions and things to polish
10    out cars and make the paint look perfect.
11 Q  Are those mechanical tools used for assisting in
12    changing out the oil or tires, things of that nature?
13 A  Yeah.
14 Q  Do you have training, formal or otherwise, regarding the
15    valuation of vehicles?
16 A  No formal valuation.  No formal education, sorry.
17 Q  What type of experience have you had over your lifetime
18    in the valuation of vehicles?
19 A  My dad sold Fords for 35 years in Yakima, Washington.
20    And I sat in a used car shack every Sunday and I watched
21    him sell used cars.  And I have bought and sold 40
22    cars -- at last count -- since I was 16.  And so I --
23    because of that I have just developed a knowledge of the
24    process.
25 Q  How did you come to be so interested in buying and
```

```
 1    selling cars to the tune of 40 over the past -- would

 2    that be 40 years?

 3 A  Yeah.  16 -- 42 years, yeah.  Again, my dad -- I love my

 4    dad, and that's what my dad did, and that was my way off

 5    the ranch.  I had a horse and I had cows, and those just

 6    weren't nearly as interesting as cars.

 7 Q  Did you ever work for -- like your father, for Ford or

 8    any other type of dealer in buying and selling cars?

 9 A  No.  My dad was a salesman, and I occasionally bought

10    cars that he would get traded in that the dealer might

11    not want on their lot.  So they would sell an old car

12    and I might buy those, but that's all I did as far as

13    involvement, and I never had my license or anything like

14    that.

15 Q  Describe for me the transaction in which you sold cars.

16    By that I mean selling them to a private -- in a private

17    transaction, individual to individual, trade-in.

18        And what we can do is:  Looking at Exhibit No. 1, if

19    you look at page 3 and the page numbers aren't like in

20    the middle, they are to the far left.

21 A  Okay.

22 Q  And it is a response that has a chart of some of the

23    vehicles --

24 A  Right.

25 Q  -- that you have bought and sold.
```

```
 1    wind?
 2 A  Right.
 3 Q  Why is that?
 4 A  They normally don't drive as straight.  They will have
 5    some problems.  It is rare that they could have put a
 6    vehicle back together perfect and drive as well as it
 7    did coming out of the factory.  I just -- it is easier
 8    to not have anything to do with a vehicle that's been
 9    damaged, because when you go to sell it and it doesn't
10    have any damage.  So --
11 Q  And the sale of that 2000 BMW Z3, did the individual who
12    purchased it from you for $27,000 ask you if the vehicle
13    had been in an accident?
14 A  I don't recall.  But normally, yeah.  I always get that
15    question.
16 Q  Do you believe that every vehicle that's been in an
17    accident and repaired suffers a dimunition in its value?
18              MR. HANSEN:  Objection to the extent we
19    are not offering him as an expert.  You can certainly
20    state your opinion.
21              THE WITNESS:  Yeah, I have found -- well,
22    I am sorry, can you repeat the question?
23              (Pending question read back.)
24              THE WITNESS:  Not every vehicle.  Some
25    vehicles can be restored to the point where they
```

1    would -- they would -- if they have other value because

2    they are unique, a rare vehicle or something like that,

3.   the fact that they have been in an accident and then

4    restored may not effect the value?

5        Boy, that's a tough question to answer.  I guess I

6    should back up and say yeah, I believe that every

7    vehicle has a diminished value after they have been in

8    an accident, period.

9    BY MS. DAWSON:

10 Q  Would you agree with me that determining whether or not

11   a vehicle has suffered any diminution in market value,

12   you need to know what the value of the vehicle is before

13   it has been in an accident and repaired?

14               MR. HANSEN:  Same objection, and I will --

15   as far as this line of questioning is concerned I will

16   stop making the objections.

17               THE WITNESS:  Could you read the question

18   back.  Thanks.

19               (Pending question read back.)

20               THE WITNESS:  Boy, I see why I am

21   confused.  I guess, for me, there is a value that is

22   what a vehicle is worth with a good history, which means

23   no repair -- no body repairs and good maintenance on the

24   engine.  And then there is a value that is what the

25   vehicle is worth after repairs to the body or to the

1  A  Yes.  And the only change from that or the only

2     different information or answer I have for that is that

3     when it has been restored by the restorer, they can be

4     of a greater value.

5  Q  I guess I am not understanding what you mean by

6     restorer, because essentially if the vehicle prior to

7     the accident had dings in it and the paint was

8     peeling --

9  A  Uh-huh.

10 Q  -- it gets in an accident, then it goes to a quality

11    repair shop that restores the vehicle to its

12    pre-accident condition by -- well, actually it is not

13    restoring it to its pre-accident condition, it would put

14    on parts if it were doing that that had dings in it and

15    paint chips in it.

16       But if the repairer puts a fresh coat of new paint,

17    matches it to the rest of the car, puts on a part that

18    doesn't have any dings or dents in it, then my question

19    to you is:  Is that vehicle in better condition

20    post-repair than it was pre-accident when it had dings

21    and chips in it?

22              MR. HANSEN:  Objection as to form.

23              THE WITNESS:  Let's see, what I want to

24    say is:  Is it in better condition?  It depends.  But is

25    it worth more?  No way.

```
 1    BY MS. DAWSON:

 2 Q  So if I were to go to Edmunds prior to the accident and

 3    put in, let's say, it was a Toyota Camry.

 4 A  Uh-huh.

 5 Q  And I put in the mileage, the make, the model.  And for

 6    the condition -- you agree with me -- that condition is

 7    one of the elements that impacts the value of the car;

 8    correct?

 9 A  Uh-huh.  (Witness nods head.)  Yeah.  Sure.  Yes.  Oh,

10    sorry.

11 Q  Did I say Toyota?  If the Toyota has paint chips, dings

12    and dents, then its condition is more likely than not

13    poor; correct?  It could be?

14 A  Right.

15 Q  So when I put that into the Edmunds.com, the condition

16    of that vehicle is going to impact its value; correct?

17 A  Right.

18 Q  And so if I were to get a value for that Toyota, it

19    would provide a number; correct?

20 A  Right.

21 Q  If I put in another Toyota that did have dents and dings

22    and paint chipping off of it --

23 A  Right.

24 Q  -- all other things being equal, I would get another

25    value at Edmunds; correct?
```

1  A   Right.

2  Q   Because the condition of the vehicle that doesn't have

3      the dings and the dents and the chips, may be good or

4      dealer ready or excellent; correct?

5  A   Right.  At the end of the valuation process there is a

6      place where you put in the condition of the vehicle, and

7      it is very normal to put it in -- to rank it from

8      excellent, to very good, to good, to poor, to abused, or

9      something like that.

10  Q   Right.

11  A   Where it is in that spot that puts a different valuation

12      on it.

13  Q   Right.  So the Toyota in the poor condition is going to

14      have an actual cash value less than the Toyota in the

15      dealer ready or excellent condition; correct?

16  A   In the poor condition, yes, certainly.

17  Q   Okay.  So --

18  A   Can I step in here and say one thing?  I am speaking as

19      a collector.  I am not talking about ordinary cars.  I

20      am talking about cars that are of interest to me as a

21      collector.  From that standpoint, they are worth more to

22      me as a collector in the original paint and perfect

23      condition as came out of the factory.  Anything except a

24      fully-restored vehicle wouldn't be of interest to me --

25      more of an interest to me than that original vehicle.

1     And that's just my opinion as a collector.   I am talking

2     about collector cars.

3 Q   Okay.  And my question is about non-collector cars.

4 A   (Witness nods head.)

5 Q   In that instance, you would agree with me that the

6     Toyota in excellent or dealer-ready condition is going

7     to have higher value than the Toyota that's in poor

8     condition; correct?

9 A   Not to me, but maybe to somebody, yeah.

10 Q  Well, to the average consumer, would you agree?

11                MR. HANSEN:  Calls for speculation.

12                THE WITNESS:  Yeah.  I am going to say

13    again, I think every vehicle has a diminished value.

14    And if that vehicle has got any body damage on it that

15    has been repaired or any mechanical damage on it that

16    has to be repaired, it is probably going to draw a

17    lesser value -- it is going to have a lesser value.  It

18    is going to have a lesser value to me.  Now -- anyway.

19    BY MS. DAWSON:

20 Q  A lesser value to you.  But my question is literally

21    just asking you about these two different Toyotas, and

22    if you would agree with me the one in excellent

23    condition is going to have higher value than the one in

24    poorer condition?

25 A  Yeah, to someone probably.  I guess I am not -- I guess

```
 1     we have entered a gray area where --
 2  Q  Well, I mean, you have testified that you used that -- I
 3     think it was Edmunds dot --
 4  A  Right.
 5  Q  -- website before?
 6  A  Right.
 7  Q  And I think you did agree with me that if the condition
 8     of the vehicle is better, all other things being equal,
 9     it is going to be a higher value than a vehicle that is
10     in a poor condition; correct?
11  A  I have got to say -- this is a critical thing for me
12     personally.  I am looking -- I want the original paint.
13     If it is not the original paint on the car, I think it
14     has been damaged and it has been wrecked and therefore
15     has a lesser value, diminished value.  And that's my
16     personal opinion, but I feel very strongly about that.
17  Q  Well, I understand that.  And I just want you to try to
18     answer my question.
19  A  Okay.
20  Q  Because right now I don't think you are answering my
21     question.  You are talking --
22  A  Okay.
23  Q  -- but you are not answering the question that I have
24     been asking.
25  A  Okay.  Do you think we can read it back?  Is that --
```

```
 1 Q  Sure, or I can say it again.  Would you agree with me

 2    that a Toyota that is in poor condition --

 3 A  Is worth less --

 4 Q  Is going to be worth less than a Toyota, all other

 5    things being equal, that has a ranking of dealer ready

 6    or excellent condition?

 7                  MR. HANSEN:  In the Edmunds?

 8                  THE WITNESS:  In the Edmunds, yeah.  Yes.

 9    BY MS. DAWSON:

10 Q  So the value of the Toyota that's in excellent condition

11    and the value of the Toyota that's in poor condition --

12 A  Uh-huh.

13 Q  -- are going to be different before either one of those

14    vehicles gets into an accident?

15 A  Right.

16                  MR. HANSEN:  Are you still talking about

17    Edmunds?

18                  MS. DAWSON:  Yes.

19                  MR. HANSEN:  We are not holding him out as

20    an expert as far as Edmunds is concerned, you are just

21    talking about his personal experience?

22                  MS. DAWSON:  That's correct.

23                  THE WITNESS:  Yeah.  Thanks.

24    BY MS. DAWSON:

25 Q  I believe, as you provided your testimony, that you
```

```
1    believe that collectors like yourself are different from
2    the kind of average consumer driving vehicles?
3 A  Uh-huh.  (Witness nods head.)  Yes, sorry.
4 Q  Is it your goal with your purchases and sales that you
5    make money off the sale of the vehicle?
6 A  That's something that's nice to have but it is not my
7    sole purpose.  My sole purpose is to buy a vehicle
8    that's fun or interesting.
9 Q  Going back to your response to Interrogatory No. 1, if
10   we go down the list can you tell me which are -- and
11   let's kind of agree what these terms mean.
12 A  Sure.
13 Q  Can you tell me which ones are collector vehicles
14   versus, you know, the vehicle that you take to go to the
15   grocery store to pack up your groceries in and go back
16   home?
17                 MR. HANSEN:  Okay.  Could you ask him to
18   define --
19   BY MS. DAWSON:
20 Q  Sure.  Can you define what a collector vehicle is?
21 A  A collector vehicle is one that is unique by
22   manufacturer or has a -- most of them have
23   high-performance type running -- or engine transmission,
24   and they have obviously -- they have got a style or they
25   are a two-door coupe or they are a convertible or a
```

1    sports car or something that makes them unique -- and

2    not very practical oftentimes, but makes them unique.

3         So looking down the list, both the Z3s are

4    two-seater convertible; not a practical car at all.

5         The M Coupe is a two-seater coupe, closed-top coupe.

6    Very powerful engine, not at all useful as a grocery

7    getter.

8         The '98 M3 is, again, a very powerful coupe, not

9    particularly useful, although it does have a back seat.

10        The 540 is a four-door sedan, very useful car,

11   wonderful car.  Very useful as a normal grocery getter.

12        The 2002 M3 coupe is a very high-performance, small,

13   very small back seat.

14        2006 Mazda Speed -- is a four-door sedan, and so it

15   has some useful features, but it was a 2.3

16   high-performance, turbo-charged engine, with a six-speed

17   transmission.  It was definitely a high-performance car,

18   and therefore not of interest to somebody who is just

19   going to get groceries.

20        And the 2003 FX45, that's a -- that's a fine grocery

21   getter.  It has got four doors and -- well, five doors

22   if you count the back, and it could hold stuff.  It has

23   got a giant engine, 4.5-liter, double overhead cam,

24   32 valve, and so it is really more than anybody would

25   ever need for that.

```
 1        The Scion TC is a very practical car and it has
 2     got -- it is a two-seater, it is kind of sporty in
 3     shape, but it is really a very practical grocery getter.
 4        And the 2007 Toyota Camry Hybrid is a four-door
 5     sedan, a very practical car, and of course gets 40 miles
 6     a gallon on a good day, so it is very useful.
 7  Q  Then you have one more on the next page.
 8  A  Okay.  2006 Honda Odyssey Touring.  Couldn't be more
 9     practical.  It is an absolutely useful vehicle.  Get
10     anything in it as well as eight people -- and get eight
11     people in it and the luggage coming back from the
12     airport.
13  Q  Okay.  Do you do the detail work on the cars you
14     purchase and then sell?
15  A  Yeah.  Almost always.  I am trying to pick any one that
16     I didn't.
17  Q  Do you make any upgrades to the vehicles that you
18     purchase?
19  A  Yeah.  I almost always buy some things to improve them,
20     that kind of thing, or change them.  You almost always
21     do, yeah.
22  Q  Describe for me the typical ad that you put in when you
23     are trying to sell one of these vehicles.
24  A  I will list -- let's see, I just list the vehicle and
25     the miles and whether or not I know if it has had any
```

1     damage, and the maintenance history that I know of on

2     it.  I am just trying to give people a sense that I try

3     to be very honest and helpful and try to tell them what

4     I would want to know if I were buying that vehicle.

5  Q  Do you recall the advertisement that you did for the

6     2006 Mazda Speed 6?

7  A  I don't -- do I recall it?  Yeah.  I know it was

8     electronic, meaning I had it on Auto Trader or online or

9     Craig's List.  I don't know which, but it would have

10    been electronic.  It would have had a picture with it.

11    I would have talked about it, which it is a very unique

12    vehicle.  So I would have pointed out that it was

13    four-cylinder, 2.3-liter, double overhead cam,

14    turbo-charged, with six speed.  I mean, that's pretty

15    rare.  And I remember commenting that it was the no

16    sunroof model, which meant it was a super light model.

17    It normally has better performance than others.  And it

18    was the all-wheel drive, which was unique to the Mazda

19    Speed 6 version to the 6 series Mazda.

20 Q  So you will need to educate me a little bit, I

21    apologize.  So is it the size of the engine that makes

22    it unique, the horsepower?

23 A  No, size of the engine, a 2.3, was pretty normal.  But

24    it was double overhead cam.  And it was -- I forget, I

25    think it is -- it was 260 horsepower, I think.  Yeah,

```
 1    260 horsepower, which is a ton of horsepower for a

 2    little car.  And it has a six-speed transmission, which

 3    is fairly unusual.  And it was all-wheel drive, which is

 4    also not that -- well, in 2006 it wasn't that unusual --

 5    I mean, it wasn't that normal.  It was a little bit

 6    unusual.  I am sorry -- I am trying to remember your

 7    question.

 8 Q  I was just trying to figure out what made it unique.

 9 A  It really wasn't that unique, but it had a six-speed

10    transmission, it had all-wheel drive, it had a 2.3 liter

11    turbo-charged engine with double overhead cam and --

12    turbo-charged anyway.

13        It was a fairly unique model.  They didn't make

14    thousands of them -- well, they may have made thousands,

15    but it would have been not that many.  The dealer where

16    I bought it only had one.  This was the only one that

17    would have had no sunroof that I saw.  So this was -- I

18    thought, a unique vehicle, very light, very

19    high-performance vehicle.

20 Q  How did you, if you recall, upload the ad to either --

21    you said AutoTrader.com or Craig's List -- for the 2006

22    Mazda Speed 6?

23 A  I would have just put -- I would have written the ad and

24    I would have uploaded from my camera into my computer

25    and from my computer into the Craig's List or
```

```
 1    normally don't ever beat them.  Anyone who thinks they
 2    do is crazy.
 3    BY MS. DAWSON:
 4 Q  But you would agree the average person doesn't buy and
 5    sell 35 cars; correct?
 6 A  If I told them how many cars I bought and sold they
 7    would think of me a little different than your average
 8    Joe.
 9 Q  Besides Edmunds, are there any other resources you go to
10    or any process that you personally go through in
11    determining what price to list a car for?
12 A  I just found Edmunds to be real accurate, so that's why
13    I used it.  I thought it was most accurate.  There are
14    Kelly Blue Book.  There are all kinds of different
15    sources, and none of them I felt were as useful or as
16    accurate as Edmunds.
17 Q  Besides mileage and condition of vehicle, what other
18    factors does Edmunds look at in calculating the value of
19    the car?
20            MR. HANSEN:  Same objection as previously
21    made about him being an expert on Edmunds, but based
22    upon what you have observed you can certainly answer.
23            THE WITNESS:  Yeah, it gets down to
24    basics.  There are only a couple of things you can
25    compare on cars, how are the tires, how is the
```

```
 1    times, I think, and had the oil changed.
 2 Q  Did you ever have any type of appraisal or valuation of
 3    the Mazda done prior to the accident that is the
 4    subject --
 5 A  No.
 6 Q  -- of this lawsuit?
 7 A  No.
 8 Q  Did you ever try to sell the Mazda prior to the accident
 9    that is the subject of this lawsuit?
10 A  I don't think so.  I don't recall.
11 Q  Did you plan to sell the Mazda prior to the accident
12    that's the subject of this lawsuit?
13 A  Did I plan to sell it?
14 Q  Meaning, given the history of buying and selling cars?
15 A  Yeah.  I knew I had my one-year limits when I hit my
16    boredom level and sell them, yeah.
17 Q  Would you describe -- do you have a one-year boredom
18    level with the vehicles that you purchase?
19 A  Roughly.  Some of them don't last that long.  It is an
20    expensive hobby.
21 Q  It is.  So with the Mazda would you have anticipated you
22    would have sold it in any event within a year of the
23    purchase of the Mazda?
24 A  Yeah.
25 Q  And the reason for that is truly just boredom with the
```

```
 1    vehicle?

 2 A  Yeah.  I am at home, retired, and so it is the only

 3    thing I do is my cars.  And when I get tired of

 4    polishing them and come up with one that's more

 5    interesting, I tend to sell one and get another one.

 6    So --

 7 Q  Did you first meet Mr. Persha at -- when did you first

 8    meet Mr. Persha?

 9 A  Yeah.  I was at a show at Triple XXX Root Beer.  I can't

10    remember if it was a Corvette show or something.  It was

11    a specialty car show of some kind.

12 Q  Who came up to who?

13 A  He was -- he was in front of a car talking about the

14    insurance that he was providing to somebody.  And I

15    happened to tell a group about the insurer that I was

16    using for it.  And I think after that he commented to me

17    that he could do the same thing.  So I guess he came up

18    to me.

19 Q  After you all met at the specialty car show, what was

20    the next step in terms of you working with Mr. Persha to

21    look at options for insurance?

22 A  I would have got a couple of quotes.  I would have given

23    him quotes, and you know, list of cars and list of

24    drivers, and license numbers for the cars and the

25    drivers so that he could do whatever he has to do to
```

```
 1    regarding what was payable under the UMPD coverage with

 2    Safeco?

 3 A  No.

 4 Q  Do you recall receiving a copy of your automobile

 5    insurance policy with Safeco?

 6 A  Uh-huh.

 7 Q  You need to say --

 8 A  I am sorry, yes, I do.

 9 Q  Did you read the insurance policy that you received from

10    Safeco regarding coverage for your automobiles?

11 A  No.

12 Q  Tell me everything you remember about the accident

13    involving your 2006 Mazda.

14 A  My older son -- oldest son was working that day, and he

15    was having trouble getting home.  It was one of those

16    days in Seattle where we had tons of snow.  In fact, we

17    had snow on top of ice that was there from previous

18    days.  So it was horrible driving conditions, and it was

19    snow on top of ice.

20        And I was sitting home watching television, safe and

21    sound, and my son called me and he was having trouble

22    getting home.  He lives in Issaquah up on top of the

23    hill, mountain.  So I decided to go try and give him a

24    ride home, because he couldn't get his car up the hills.

25    So I went to try to pick him up in my car, the Mazda,
```

1     and take him home.

2          And anyway, he was waiting at Fred Meyer at the

3     bottom of the hill.  And I went down and he was -- he

4     was gone.  He wasn't there.  And unbeknownst to me, he

5     had gone off and borrowed a car from a neighbor -- from

6     his aunt, a Land Cruiser that would make it up the hill

7     and come back.

8          So in the meantime I proceeded to try and go up the

9     hill to either go to my house or his house.  And it was

10    treacherous.  There were 14, 15 cars all over the hill

11    pointing different directions and everything.  You can't

12    imagine how horrible it is from Atlanta.

13         But anyway, I got up the hill part of the way and

14    pulled over to the side.  And when I came -- and left

15    the car, and went down the hill and got a ride with my

16    son in the Land Cruiser and he got me home.  When we

17    went back the next day, my car had been dented in the

18    front.  So --

19  Q  Do you recall that the accident occurred around

20    January 11, 2007?  Does that sound correct?

21  A  That's my memory.  And boy, if we could go back and look

22    at snowfall total we could get the exact day.

23  Q  Describe for me what you saw when you came out and

24    discovered your vehicle had been hit.

25  A  I pulled up and there was a snowplow going around it --

```
 1 A  Right.

 2 Q  What did you do after you were able to drive the car

 3    down the hill?  What did you do next?

 4 A  I would have gone up to a different road, which was in a

 5    lot better shape since they had sanded it and

 6    everything, and I would have gone up and gone home the

 7    next day.

 8 Q  When did you decide to take the car in for repair?

 9 A  About a month later.  I was hoping it wasn't going to

10    exceed my deductible, so I just went in.  I was just

11    going to get it fixed on my own, at my own expense,

12    because I didn't think it was going to pass the

13    deductible, but it did.

14 Q  Why did you wait a month to go get the vehicle fixed?

15 A  I was frustrated.  It was drivable.  I was frustrated

16    with myself that I had left it there and it had gotten

17    hit and that I -- that it was -- that I had gone out

18    after I was sitting at home, in a nice warm home, I

19    chose to go out and try to rescue my son.  I just felt I

20    had been pretty dumb.

21 Q  How did you select Haury's as your repair shop to take

22    the car to?

23 A  Jeff was a club member, and I knew him very well, and I

24    knew his shop's reputation.  So I just took it there.

25 Q  Tell me about taking the vehicle to Haury's.  Who did
```

Q I thought I heard in one of your answers that you had a valuation done of your vehicle?
A No.
Q So after the accident you did not have any type of valuation done on the Mazda; is that correct?
A I had a bid to do the work to it and then this is the repair bill for that work.
Q Yes. What I am trying to get at is when -- what prompted you to call Ms. Bullis or send her an e-mail saying, "I think I have a diminished value claim"?
A Okay. Good question, and I don't recall. And I am not trying to be hard to get along with, I don't recall.
Q What would help you recall, if anything?
A Well, I could look at the e-mail that I sent my attorney, and that would have a date on it. I don't know what -- what that might add, but I could add a date that way.
Q Yeah. I am just trying to figure out sort of what motivated you after -- I think you said a year from the repair to decide, Hey, I think I will call that attorney today and make a diminished value claim?
MR. HANSEN: Object to the extent it mischaracterizes his testimony. I think he said he doesn't recall when.
THE WITNESS: Yeah, I do not recall.

```
 1     BY MS. DAWSON:
 2  Q  So your testimony here today is you have no idea what
 3     prompted you to contact an attorney and raise the issue
 4     of diminished value; is that correct?
 5  A  Boy, I don't remember right now, and I am trying to
 6     think what I could jog my memory with.  During the time
 7     I seem to remember that there were some club seminars
 8     going on or club seminars talking about diminished
 9     value, and it may have been one of those but I couldn't
10     tell you specifically that I read an article on
11     diminished value and thought, I got one of those.  I
12     don't know when that happened or when I came up with
13     that idea.
14  Q  Who organizes the club seminars?
15  A  The club officers.
16  Q  Who are the club officers currently?
17  A  There is about eight people and there is a president --
18     anyway, he is the docent down at the museum we were
19     talking about.  And there is a woman who puts out the
20     Zündfolge, she is the editor, and there is a treasurer.
21     I think that's -- anyway, I am sorry, if I had a
22     Zündfolge magazine, they are all listed in front, I
23     could give you a list.
24  Q  Where are the meetings held?
25  A  In the fire house on Mercer Island.  They loan us a
```

```
 1    conference room in the Mercer Island Fire Department.
 2 Q  Is there a website for the club?
 3 A  Oh, yeah.
 4 Q  What is the website address?
 5 A  PugetSoundBMW.org.
 6 Q  Does the website have a listing of the officers?
 7 A  Yeah.
 8 Q  Does the website have postings of any handouts or
 9    materials that are featured seminars?
10 A  It wouldn't have handouts.  It would have a listing of
11    the club seminars and club drives and club car shows and
12    those kinds of things.  So it would list all that kind
13    of thing, it wouldn't have handouts.
14 Q  Did you talk to anybody besides your attorney regarding
15    the fact that you believed you had diminished value on
16    the Mazda?
17 A  No.
18 Q  So there is no one else that I could speak to regarding
19    your diminished value claim for the Mazda besides your
20    attorney?
21 A  I don't believe I talked to Jeff Butler about diminished
22    value, and I know I talked to my attorney, so that's the
23    extent of that conversation that I can recall.
24 Q  How did Ms. Bullis become your attorney?
25 A  She represented me in a dispute with Safeco over the
```

```
 1     deductible on the same repair, the same repair -- the
 2     deductible I think should have been 300 bucks, and they
 3     required me to pay 500 bucks, I think, per the paperwork
 4     here.
 5  Q  So if there is any correspondence from Ms. Bullis to
 6     Safeco in approximately January 2009 regarding the
 7     deductible, does that jog your memory as to whether
 8     diminished value was raised by you at that time?
 9  A  I think it was a lot later than that.  See, I settled
10     the whole process and all the repairs and paid the
11     amounts, and then I tried to get reimbursement from
12     Safeco.  And I did not -- I did not get paid the
13     deductible amount for uninsured.  I was paid a
14     deductible for collision, I think.  And so it was a long
15     time after -- I don't think the two events -- I don't
16     think it happened in January or February of 2007.  I
17     think there was time elapsed before I was given the
18     correct amount for the deductible.
19  Q  My question actually referenced a date of January 2009.
20     I believe that's what I said.  I am not talking about
21     2007.
22  A  Okay.  I am sorry.  Read back the question, then.
23                  (Previous question read back.)
24                      THE WITNESS:  No, it didn't jog my memory.
25     BY MS. DAWSON:
```

```
 1 Q  Did you think about diminished value on the Mazda at the

 2     same time you were talking about the deductible amount

 3     that was applied to that claim?

 4 A  Good question.  I think maybe -- well, let's see.  "I

 5     don't know" is the answer, but that may have happened.

 6 Q  How did you come to be represented by Ms. Bullis in

 7     connection with the deductible?

 8 A  I was referred to her by Jeff Butler of Haury's.

 9 Q  When were you referred -- or when were you provided

10     Ms. Bullis's name as an attorney by Mr. Butler?

11 A  I don't know.  It would have been sometime after the

12     repair was finished, but I don't know when.

13 Q  Do you recall there being a difference in the amounts

14     that Safeco reimbursed Mr. Haury's -- I mean, Mr. Butler

15     and the charges Mr. Butler had for repair of your

16     vehicle?

17 A  Yeah.

18 Q  Do you recall whether or not at that time Mr. Butler

19     referred you to Ms. Bullis as an attorney to talk to?

20 A  I don't.

21 Q  Is it true that you were referred to Ms. Bullis by

22     Mr. Butler after you had your vehicle repaired by

23     Mr. Butler?

24 A  Yeah.

25 Q  Did Mr. Butler -- how did Mr. Butler refer you to
```

```
 1    anything.  I just said, "When do I get my car back?"
 2  Q  When you received the Mazda back after it had been
 3     repaired, did you have any issue with the quality of the
 4     repairs?
 5  A  No.
 6  Q  How would you characterize the quality of the repairs
 7     done by Haury's on your Mazda?
 8  A  It was good.
 9  Q  Going back to Exhibit No. 3, page 61, have you ever seen
10     this document before?
11  A  No.  This is the first time I have seen this.
12  Q  When did you decide that you wanted to file an insurance
13     claim with Safeco in connection with the Mazda?
14  A  I sent a note to my attorney and asked her --
15                 MR. HANSEN:  Again, don't discuss --
16                 THE WITNESS:  Okay.
17                 MR. HANSEN:  -- what you talked with your
18     attorney about.
19                 THE WITNESS:  Okay.  So I just would say I
20     sent a note on the date to my attorney.
21     BY MS. DAWSON:
22  Q  Okay.  Just so I am clear, my question was when did you
23     decide to, like, file an insurance claim with Safeco for
24     the damage and repair of your Mazda?
25  A  It was quite a while afterwards, and I don't know
```

Page 96

1    specifically when it was.

2 Q  Okay.  Well, the accident was January 11, 2007; correct?

3 A  Right.

4 Q  And according to Safeco's records, you called them to

5    make a claim on --

6 A  February, I will bet.

7 Q  February the 27th, 2007?

8 A  Okay.  That sounds right.

9 Q  That sounds right?  You called Safeco around the 27th,

10   2007?

11 A  Yes, because it would have been in there and torn apart

12    by Jeff and company at Haury's, and then we called

13    John Brennan to come and take a look at it, John Brennan

14    being the estimator for Safeco.

15 Q  Why did you wait until February 27, 2007 to notify

16    Safeco regarding the accident that occurred on

17    January 11th, 2007?

18 A  I thought the damage was very minor, and that I thought

19    I was going to afford to pay it, it was going to be less

20    than my deductible anyway, so I was just going to pay it

21    to be repaired.

22 Q  So looking at Exhibit No. 4, does that refresh your

23    recollection as to why you decided to make a claim with

24    Safeco on February 27, 2007?

25 A  Well, to the point that it comes out to 1,500 bucks,

```
 1    yeah.  Because I think -- I can't remember what my
 2    deductible was, I think 500, and it was well over that,
 3    three times that in the original estimate, and then the
 4    final real bill came out to 2,800 bucks.
 5 Q  After the repair of the vehicle, did it look any
 6    different from how it looked before the accident?
 7 A  No.
 8 Q  Did the car drive any differently post-repair than it
 9    did before the accident?
10 A  No.
11 Q  Did the car function mechanically post-repair as it did
12    before the accident?
13 A  Yeah.
14 Q  What, if anything, did you discuss with the Safeco
15    adjuster regarding the repairs to your Mazda?
16 A  It was interesting, because Mr. Brennan called me and --
17    first off, he assured me Jeff had a good shop.  He said
18    "Haury's is quality, you will get a quality job from
19    there."  Then he said, "Their labor rate is real high.
20    They are going to charge you more than normal."  And I
21    said, "That's okay, if it is just the labor rate
22    difference, I will pay it because Jeff has a good
23    reputation.  I want it done there."
24        And so then we went off.  And at that time I didn't
25    realize -- I think -- I think Brennan shouldn't have
```

Page 108

```
 1      I mean, it just -- I put it together and I sent her an
 2      e-mail and asked her to go after it.
 3  Q   So at the time that the car was being repaired you were
 4      thinking that the Mazda perhaps was --
 5  A   No.
 6  Q   -- going to be suffering diminished value?
 7  A   No.  No way.
 8  Q   Okay.  So -- well, my question is:  When did you first
 9      think my Mazda --
10  A   Diminished value?
11  Q   -- has diminished value?
12  A   After I experienced the sale.
13  Q   Okay.
14  A   When I suffered the diminished value.
15  Q   Okay.  So at the time that you sold the vehicle to
16      Michael Smith is when you believe that you suffered a
17      diminishment in value on the Mazda?
18  A   Right.
19  Q   Why is that?
20  A   Well, because that's when it was quantifiable.  I sold
21      it for the price I sold it for, and I had been
22      previously advertising and trying to get more money for
23      it, and that's when I realized I was probably stuck with
24      the diminished value that I sold it for.
25  Q   And the sale of the Mazda was on August the 11th, 2007;
```

```
 1    is that correct?  I am sorry, this is my only copy.
 2 A  Right.
 3         (Exhibit No. 5 marked for identification.)
 4  BY MS. DAWSON:
 5 Q  I believe the court reporter is showing you what's been
 6    marked as Exhibit No. 5.  Do you recognize that
 7    document?
 8 A  No. 5, right.
 9 Q  What is No. 5?
10 A  It is my bill of sale document to the Smiths for the
11    Mazda.
12 Q  How much had you listed the Mazda for?
13 A  23,000, I think.  I had worked my way down.  I certainly
14    wasn't trying to sell it for 18.5.
15 Q  So you believe that you submitted an ad to Auto Trader
16    or Craig's List listing the Mazda in the amount of
17    $23,000; is that correct?
18 A  That's my memory.
19 Q  And as I recall your testimony previously, the ad said
20    the Mazda was, quote, "perfect"; correct?
21 A  In the picture and in the written ad I was quick to
22    respond that it was not perfect and had been actually
23    damaged, but I went into great detail about how I had it
24    repaired.
25 Q  Did you affirmatively disclose that or did people that
```

```
 1      saw the ad ask you the question has it been in an

 2      accident?

 3 A    I affirmatively disclosed it because I was thinking I

 4      had done it in a very quality way and I spent a ton of

 5      dough doing it.  So I thought it was a way to assure

 6      people it was not a problem.

 7 Q    Besides Auto Trader and Craig's List, did you make any

 8      other efforts to sell the Mazda?

 9 A    I can't think of any.  Normally with my BMWs I would

10      always -- told the club, club members I was trying to

11      sell it.  But the Mazda, I don't think I did that just

12      because it was a Mazda.  So I didn't have the built-in

13      interest.

14 Q    Did you go to any dealers locally and attempt to trade

15      in the Mazda?

16 A    No.

17 Q    Did you go to any local dealers and attempt to sell the

18      vehicle to them so they would in turn resell it?

19 A    No.  I think it was advertisement in the -- I was trying

20      to sell it in any usual way, which was Auto Trader or

21      Craig's List.

22 Q    How did you come up with the $23,000 value on the

23      vehicle when you listed it?  How did you decide I am

24      going to list the vehicle at $23,000?

25 A    That was as much as I thought I could possibly get for
```

```
 1    it.
 2 Q  Did you do what you normally do, which was to do the
 3    Edmunds--
 4 A  Right.
 5 Q  -- valuation?
 6 A  Right.
 7 Q  What information did you put in Edmunds regarding the
 8    Mazda?
 9 A  That it had 11,000 miles on it, that it was a very light
10    model without a sunroof.  And so it was, I thought, a
11    very special car, and -- I had very carefully protected
12    it from paint chips and that kind of thing.  So I
13    thought it was a very nice car.  A very nice example.
14 Q  Was it fair to say you took the Edmunds valuation and
15    used that to inform your decision as to how much to list
16    it?
17 A  I think so.  I can't remember how it was coming out.
18    You know 23 is a long ways from 18.  So I could see I
19    was having a tough time.  It wasn't selling, I couldn't
20    figure out exactly why not, and so I had to get very
21    aggressive on the price to sell it.
22 Q  I am just trying to figure out if, for example, do you
23    recall if the Edmunds was lower than that but you
24    thought this isn't the average Mazda, it has, as you
25    were describing, special -- there are some features
```

```
 1    associated with it that make it different from other

 2    cars, and so you factored that into the price that you

 3    ultimately came to in listing it?

 4 A  Yeah.  I -- boy, I was surprised, I think, that I

 5    couldn't generate any interest in it at all at 23, 21.

 6    I think I was pushing it at 19.  I think I was really

 7    trying to sell it.  I couldn't get any interest in it

 8    and I was surprised.

 9         And I think Edmunds, if I were to run -- well, I

10    don't know, but I am sure I ran an Edmunds with

11    11,000 miles on it in perfect shape.  And I would have

12    come up with whatever it told me.  I think 23 is

13    probably where I would have started.

14 Q  Okay.  What I was just trying to get at is whether or

15    not you had a recollection of what the Edmunds number

16    was and if it was $23,000?

17 A  Just from memory, yeah, I think it was.  And -- but

18    that's from memory.

19 Q  How many individuals responded to your ad on Auto Trader

20    or Craig's List for the Mazda?

21 A  Fewer than usual.  Two or three responded, but that was

22    fewer than usual.  When I advertised my BMWs it would be

23    7, 8, 10.

24 Q  Tell me what you can recall about each of the

25    responders.  Let's just call, the first one, responder
```

```
 1      don't remember enough about them to really say anything.
 2  Q   Was there a negotiation with responder No. 2 over the
 3      price?  Did they say, "I saw your ad, I am willing to
 4      give you 19," whatever it might be?
 5  A   I don't recall.
 6  Q   How about responder No. 3 --
 7  A   Again, I just don't recall.  Michael stuck out because
 8      he bought it and because I remember all the
 9      conversations with him, just --
10  Q   What -- did Michael provide a counteroffer to your
11      $23,000?
12  A   Boy, he must have.  I guess, I think of a counteroffer
13      as somebody where they say a specific amount to you.  He
14      may have just said, "Look, I can't afford it at that
15      price."  And then I tried to say, "Well, where can you
16      afford it?"  And, "Where could you do this deal?"  And
17      so --
18  Q   With the Parkinson's, does that impact your ability to
19      drive?
20  A   Absolutely.
21  Q   How does it impact your ability to drive?
22  A   Well, my -- either foot will tremor -- not at the same
23      time, but left or right will tremor.  And would -- and
24      touching the gas pedal, you can't hold it smoothly on
25      the gas pedal.  So I tend to -- you can't drive a car
```

```
 1    with a stick without a dependable foot.  You need at
 2    least one foot.
 3 Q  So was the Mazda a stick?
 4 A  Yeah, six speed.
 5 Q  How about the other cars that you have, are they
 6    automatic or stick shift?
 7 A  They are almost all stick.  I am currently driving a van
 8    now, which is an automatic, for that reason.  Where was
 9    that -- anyway, the -- but almost all my BMWs were
10    sticks, because that's normally -- those are enthusiast
11    cars, so that's what they are.
12 Q  Is one of the reasons that you wanted to go ahead and
13    sell the Mazda was because of the fact that it was a
14    stick shift?
15 A  Yeah.
16 Q  Besides Michael Smith, did you speak with anyone else in
17    the Smith household regarding the sale of the Mazda?
18 A  Yeah.  Christine, his mother, she was a wonderful woman,
19    assured me that they were going to be there with a
20    cashier's check.  And that's -- they are the most
21    wonderful family I ever met.  Really nice people.
22 Q  Did the Smiths ask you about the accident and repair of
23    the Mazda?
24 A  I told them in the negotiation with Michael.  I don't
25    remember if I told the family later but I told Michael.
```

```
 1     Michael knew.
 2 Q   And did they know that one of the reasons for selling
 3     the Mazda was because it was a stick shift?
 4 A   Yeah.  Absolutely.
 5 Q   How long -- between the time that you listed the Mazda
 6     for sale and the purchase, how long a period of time was
 7     that?
 8 A   Three weeks or a month is my guess.  I remember it -- it
 9     wasn't instant because it wasn't selling right away.
10     And I remember I was -- it was interesting to me that
11     Michael stuck with it all the way through, that he
12     didn't lose interest.  I kept thinking, gee, a young kid
13     like this, he will go off and love something else the
14     next day.  And he didn't.  He was real consistent on
15     wanting it.  And he knew what it was, which was valuable
16     to me.
17 Q   What do you mean by that, the fact that he knew what it
18     was --
19 A   That it was a special model, Mazda Speed 6, no sunroof.
20 Q   So it is fair to say that you liked the fact that
21     Michael was an enthusiast about the vehicle that you
22     were?
23 A   I wouldn't have driven it to Phoenix if he wasn't.
24          (Exhibit No. 6 marked for identification.)
25
```

Page 118

```
 1    BY MS. DAWSON:

 2  Q  I am showing you, Mr. Hovenkotter, what's been marked as

 3     Exhibit No. 6.  Do you recognize this document?

 4  A  Yes.  Title.

 5  Q  So I think you were describing the first page,

 6     Hovenkotter 2, what is that?

 7  A  It is the transfer of title, just the title document,

 8     and it has got 18,500 price.  And -- let's see, I

 9     thought these things had mileage on them, too, but I

10     guess not.  Yeah, it has license number and the amount.

11  Q  Do you recall what the mileage was on the Mazda when you

12     sold it to Michael Smith?  And you can refer --

13  A  I think -- it was 11,869, I think.  My memory.  Let me

14     see.  I got it right here.  11,869, yeah.

15  Q  And Hovenkotter 3, 4, and 5 are what?

16  A  Okay.  Five is a -- just the disclosure of the tenths on

17     the odometer, 11,869.  And four is the bottom part of

18     the original purchase agreement for the car.

19  Q  And three?

20  A  And three is the top half of the purchase agreement.

21  Q  And were these all documents that were in your

22     possession?

23  A  Right.  Supplied by me.

24           (Exhibit No. 7 marked for identification.)

25
```

1    currently seeking treatment for Parkinson's disease?

2  A   Monique Giroux, G-i-r-o-u-x.

3                MS. DAWSON:  Let's take a break.  I am

4    going to move a different direction.

5                     (Short break taken.)

6        (Exhibit Nos. 9 and 10 marked for identification.)

7    BY MS. DAWSON:

8  Q   Mr. Hovenkotter, I am showing you what's been marked as

9    Deposition Exhibit No. 10, and it looks like it is six

10   photographs --

11 A   Uh-huh.

12 Q   -- of the Mazda that you sold to Michael Smith; is that

13   correct?

14 A   Right.  Right.  Right.  Yep.

15 Q   So the pictures depicted in Deposition Exhibit No. 10

16   are the vehicle post-repair by Haury's?

17 A   Correct.

18 Q   Can you tell me what this blue tape is on the vehicle?

19 A   It is a makeshift rock guard.  My intent was to deliver

20   it to Michael Smith as perfect as I could get, and the

21   car was in very good shape with the paint, of course, so

22   that's on there to avoid any rock chips between here and

23   Phoenix, Arizona.

24 Q   When the vehicle was repaired at Haury's, was any paint

25   required to be done?

Page 127

```
 1 A  Yes.

 2 Q  Where was the paint work done?

 3 A  In the front.

 4 Q  Was the paint work blended in well from the front to the

 5    existing body of the car that was not effected by the

 6    accident?

 7 A  Yeah, they did a great job.

 8 Q  Prior to the accident you mentioned the Mazda being

 9    garaged; is that correct?

10 A  Uh-huh.

11 Q  You need to say "yes."

12 A  Yes.

13 Q  Is the garage temperature controlled at all?

14 A  No.  It is just next to the house, and I have my furnace

15    in it, and so it is warmer than the outside but not

16    dramatically.

17 Q  And on average, how frequently before the accident did

18    you buff or clean or condition the car?

19 A  Wash once a week and wax about once a month.

20 Q  After the accident, did you continue to wash the car

21    once a week and buff and wax once a month?

22 A  I washed it once a week.  I didn't wax it, because wax

23    on new paint is normally not a good thing.

24 Q  When the vehicle was delivered to Michael Smith, what

25    did you then do with that tape?
```

1 A  Peeled it off.

2 Q  And again, so that there would be no rock chips in it --

3 A  Right.

4 Q  -- when it was delivered to him?

5 A  Right.

6 Q  What was Michael's reaction with respect to the

7    condition of the car?

8 A  He thought I was slightly crazy for an old man, I think.

9    I think he was pleased with the car.  Certainly it was

10   everything I said it was.  That's exactly what he

11   expected, I think.

12 Q  Do you think the Mazda is similar to the types of

13   vehicles that would be in the class that you

14   represent -- or hope to represent?

15 A  Boy, I wouldn't know.  It would be -- a class I hope to

16   represent is just Washington drivers, isn't it?  I guess

17   I don't know who would be in the class.

18             MR. HANSEN:  To the extent that the

19   complaint speaks for itself, I am going to pose an

20   objection.

21             THE WITNESS:  Okay, you are right.

22             MR. HANSEN:  You can answer to your

23   knowledge.

24 BY MS. DAWSON:

25 Q  Yeah, you can answer.

```
 1    it as fast as -- 90 cars go 90 miles at a hundred miles

 2    an hour or above.  And you don't do it racing with

 3    others, you do it with a rally situation.  One is after

 4    another, but it is a five-minute difference.  I did that

 5    Silver State Classic, and I used to drag race cars when

 6    I was younger.

 7 Q  When did you do the classic rally?

 8 A  Silver State Class was 2003 or '5.  I can't remember.

 9 Q  Have you done any other rallies since then?

10 A  No.  I loved that one.  I haven't done any since.  We

11    had John Snyder, the guy from Dukes of Hazard was

12    driving the General Lee, the orange -- anyway, he was in

13    that with us.

14 Q  What amount of diminished value do you think the Mazda

15    suffered?

16 A  It suffered 11,000 bucks.  That was a lot, I thought.

17 Q  And what's the basis for your claim that the Mazda

18    suffered $11,000 in diminished value?

19 A  Well, I sold it 18.5, bought it for 29 5.

20 Q  And so you believe the entirety of the $11,000 is

21    attributable to diminution in the value of the car?

22 A  No, I put 11,000 miles on it, so I got 11,000 miles of

23    use out of it.  That's worth something, but that has to

24    be deducted from the purchase price.  And then there

25    should be an amount -- the amount that you are left
```

```
 1   with, which should be -- ideally there shouldn't be
 2   anything left.
 3       Anyway, it did not cover -- am I saying this
 4   correctly?  29,500 bucks, less an allowance for
 5   11,000 miles, and then there should be -- the amount,
 6   like, after that you should be able to sell it for.  And
 7   I couldn't sell it for any reasonable amount, it seemed
 8   like, after that.  So that tells me that was at a
 9   diminished value.
10 Q So, can you state for me how you believe the diminished
11   value should be calculated?  It sounded as if you said
12   purchase price, less depreciation for mileage?
13 A Uh-huh.
14 Q Should have been the amount that I, Mr. Hovenkotter,
15   should have been able to sell the car for.  And then you
16   subtract the amount you actually sold the car for, and
17   that difference is the dimunition of value; is that
18   correct?  Did I understand that correctly?
19 A Yeah.  I don't want to get into finding diminishing
20   value, but what you said is roughly accurate.  You take
21   the amount you paid for it, and you subtract from it any
22   depreciation amount that's based on the mileage, and you
23   look at the amount of time that expired as well.  And if
24   the car -- that also gives you the appreciation amount.
25   And then those two things subtracted from that and paid
```

```
 1    for it should be what you are able to get for it when

 2    you sell it and I wasn't able to.

 3                    MR. HANSEN:  And again, he is not being

 4    offered as an expert as to the valuation or a damage

 5    model.

 6                    MS. DAWSON:  Understood.

 7    BY MS. DAWSON:

 8  Q  So if you had been able to sell the Mazda for $23,000,

 9    you believe then that you would have suffered no

10    diminished value in that case?

11  A  I don't know.  I guess I would want to ask a diminished

12    value wizard what it should be.  That's what Edmunds

13    told me to expect, I think.  I am trying to think if I

14    could go back to recreate that.  I don't know if -- you

15    know, a 2006 Mazda is not a year-old car anymore.  I

16    don't know if I could go back and see what that would

17    tell me.

18  Q  In other words, if the price -- your asking price is

19    paid by the purchaser, then in that instance do you

20    believe that you have suffered a loss in value on the

21    car in that transaction, in that sale?

22                    MR. HANSEN:  Same objection.

23                    THE WITNESS:  Yeah.  Yeah.  I don't -- I

24    don't think I can sit here today -- I don't think I have

25    got what I need to be able to show exactly what should
```

Page 175

```
 1                   C E R T I F I C A T E

 2

 3          I, LAURA A. GJUKA, the undersigned Notary Public

 4     in and for the State of Washington, do hereby certify;

 5          That the foregoing Verbatim Report of Proceedings

 6     was taken stenographically before me and transcribed

 7     under my direction; that the transcript is a full, true

 8     and complete transcript of the proceedings, including

 9     all questions, objections, motions and exceptions;

10          That I am not a relative, employee, attorney or

11     counsel of any party to this action or relative or

12     employee of any such attorney or counsel, and that I am

13     not financially interested in the said action or the

14     outcome thereof;

15          That upon completion of signature, if required, the

16     original transcript will be securely sealed and the same

17     served upon the appropriate party.

18          IN WITNESS HEREOF, I have hereunto set my hand and

19     affixed my official seal this _____ day

20     of_____, 2009.

21

22

23

24                                _____

25                                Laura Gjuka, CCR No. 2057
```

# EXHIBIT A-2

# Case: Martin Hovenkotter v. Safeco Corporation

## Transcript of the Testimony of Scott Kohl

**Date:** December 15, 2009



## GorePerry
### REPORTING & VIDEO

515 Olive Street, Suite 700
St. Louis, MO 63101
Phone:314.241.6750
1-800-878-6750
Fax:314.241.5070
Email:schedule@goreperry.com
Internet: www.goreperry.com

Page 1

Deposition of

SCOTT KOHL

7d09ab83-7af9-42c4-9253-0b3f5f2a775b

Page 2

1              IN THE UNITED STATES DISTRICT COURT

2        IN AND FOR THE WESTERN DISTRICT OF WASHINGTON

3                        AT SEATTLE

4

5 MARTIN HOVENKOTTER,

6

7          Plaintiff,

8                              Case No. 2:09cv00218JLR

9    vs.

10

11 SAFECO CORPORATION, SAFECO

12 INSURANCE COMPANY OF AMERICA

13 AND SAFECO INSURANCE COMPANY,

14

15          Defendants.

16

17

18          Videotaped Deposition of SCOTT KOHL,

19 produced, sworn and examined on December 15, 2009,

20 between the hours of eight o'clock in the forenoon

21 and six o'clock in the afternoon of that day, at the

22 offices of Husch, Blackwell & Sanders, 190 Carondelet

23 Plaza in Clayton, State of Missouri, before TOD

24 MINNIGERODE, Certified Court Reporter No. 542 within

25 and for the State of Missouri, in a certain cause now

7d09ab83-7af9-42c4-9253-0b3f5f2a775b

Page 3

1  pending in the United States District Court in and

2  for the Western District of Washington, wherein

3  MARTIN HOVENKOTTER is the Plaintiff, and SAFECO

4  CORPORATION, et al are the Defendants, on behalf of

5  the Plaintiff.

6

7

8                    A P P E A R A N C E S

9  FOR THE PLAINTIFF:

10         Van Bunch

11         Bonnett, Fairbourn, Friedman & Balint

12         57 Carriage Hill Overlook

13         Signal Mountain, TN 37377

14         602 274-1100

15

16 FOR THE DEFENDANT:

17         Tiffany L. Powers

18         Alston & Bird

19         1201 West Peachtree St.

20         Atlanta, Georgia 30309

21

22 Videographer:  Mark Moebeck

23

24                    INDEX OF EXAMINERS

25 Direct Examination by Mr. Bunch............. Pg. 6

7d09ab83-7af9-42c4-9253-0b3f5f2a775b

Page 43

```
 1              THE VIDEOGRAPHER:  We have roughly ten

 2   minutes.

 3              MR. BUNCH:  Let's use the tape.

 4   BY MR. BUNCH:

 5       Q   When a customer is told that the vehicle's

 6   been repaired fully to -- as you call it,

 7   manufacturer's recommendations, and they wish to

 8   continue pursuing diminished value claims, what's

 9   the next step, do you know?

10       A   Yes.  So the next step obviously because

11   we're in front of the customer, by and large for the

12   most part, not all the time, the customer isn't

13   always there with us, but we like the customer to be

14   there with us when we're reviewing cars with them,

15   if they say, "I agree if the car's put back one

16   hundred percent to where it was prior to the loss,

17   but I still want to pursue a diminished value, what

18   do I do from here?"  That is when we pretty much

19   tell them to provide evidence or support of why

20   their car has lost diminished value.

21       Q   And is that true of a first party making a

22   U.M.P.D. claim or a third party?

23       A   That would be true either instance, for

24   diminished value.

25       Q   Has the company to your knowledge ever
```

7d09ab83-7af9-42c4-9253-0b3f5f2a775b

Page 44

1  developed a template or other framework for analysis

2  on arriving at diminished value loss itself?

3          MS. POWERS:  Objection.

4      A   There is no set form or template that the

5  company has developed to measure analyze D.V.

6  because there's so many factors that go into a

7  potential diminished value loss.  We have

8  established what I call over-arching guidelines or

9  things you consider when evaluating a claim that has

10  been in the form of maybe an Excel spread sheet

11  which helps you just sort of think about all the

12  factors that go into how to look or measure

13  diminished value.

14      It's gone through, you know, advice, or

15  guidelines with weekly, you know, weekly round

16  tables, on diminished value, quarterly meetings,

17  that may be a topic may include handling diminished

18  value and then -- and then there's some training

19  with our unit leaders on how to handle or manage

20  diminished value are the few I can think of right

21  now.

22 BY MR. BUNCH:

23      Q   When you reappraise a vehicle following a

24  diminished value claim to determine whether it has

25  been repaired properly how do you know what

7d09ab83-7af9-42c4-9253-0b3f5f2a775b

Page 45

1  manufacturer recommendations are for the repair?

2      A    Our unit leaders and our specialists or

3  whoever is out go or whoever is assigned to

4  reinspect that vehicle, are well-versed in auto

5  physical damage repair, our employees are mostly

6  highly experienced, for the most part body shop

7  experience, hands-on physical damage experience as

8  well as many are what we call I-CAR Platinum or

9  I-CAR Gold certified.

10     Q    So you rely on I-CAR to set the industry

11  standards for repair?

12         MS. POWERS:  Objection.

13     A    I-CAR does not set any industry standards

14  for repair, I-CAR is an independent organization

15  that sits outside the manufacturer and insurance

16  companies and simply provides training and

17  recommendations on manufacturer's recommendations.

18  So it's more additional training that some carriers

19  and many shops put their employees through.

20 BY MR. BUNCH:

21     Q    Do manufacturers and when you say

22  manufacturers you're speaking to original equipment

23  makers of vehicles, right?

24     A    (Witness nods.)

25         MS. POWERS:  Yes or no?

7d09ab83-7af9-42c4-9253-0b3f5f2a775b

Page 91

1          MS. POWERS:  Objection.

2      A    Correct.

3  BY MR. BUNCH:

4      Q    But you agree with me that in general on a

5  company-wide basis whether it's the western regions

6  or the eastern regions certainly since October of

7  2007 the general process of handling a diminished

8  value claim is the same in that a burden is on the

9  claimant to substantiate the diminished value, loss,

10  following confirmation by the company of an

11  appropriate repair job?

12          MS. POWERS:  Objection, and again this

13  witness is only a corporate designee for the eastern

14  part of the country.

15          MR. BUNCH:  Right.

16          MS. POWERS:  But you can answer what you

17  know.

18      A    So for the eastern half of the country your

19  general premise that a third party would have to

20  provide some sort of -- or would have to initiate

21  the claim for diminished value would be correct.  I

22  can't speak a hundred percent to the west but I

23  would -- can only potentially assume that that they

24  do not proactively -- what's the word I'm looking

25  for, pro-actively --

7d09ab83-7af9-42c4-9253-0b3f5f2a775b

Page 92

1      Q    Do anything different?

2      A    Do anything different, than yeah, I mean,

3  than what we do in the east.

4      Q    Right, because --

5      A    Over-arching.

6      Q    Yeah, because you know what Mr. Rollins

7  does because you have these joint meetings on a

8  quarterly basis in which you tell everybody to the

9  extent the diminished value work flow issue comes up

10  that this is the way that the company does it?

11         MS. POWERS:  Objection.

12  BY MR. BUNCH:

13      Q    Right?

14      A    During those meetings when we address

15  diminished value and it isn't addressed at every

16  single meeting.

17      Q    Right.

18      A    But when we do address them we talk about

19  general over-arching principles or factors that one

20  should consider when looking at a diminished value

21  claim.

22      Q    Right.  Well, let's drop down into the

23  level of looking at the claim establishment factors

24  themselves, you know, what factors you consider to

25  tend to prove or disprove the existence of

7d09ab83-7af9-42c4-9253-0b3f5f2a775b

Page 93

1  diminished value after adequate repair, okay?

2     A    Okay.

3     Q    What are they?

4     A    A variety of factors, I mean, one is

5  clearly the mileage of the vehicle, one can be, I'll

6  talk slow, the extent of damage on the vehicle.  One

7  could be the complexity of repair to the vehicle,

8  what percent of parts were repaired versus replaced,

9  year, make, model of vehicle, what sort of parts --

10  I may have said this, what sort of parts are

11  repaired on or replaced, what the percent of sheet

12  metal was repaired or replaced.

13        At this time those are the top three or four or

14  five things that we look at when we look at D.V.

15  repair estimate and then obviously I'm sorry, one

16  more, a fair market, a range of what that fair

17  market value of that vehicle is.

18     Q    After repair or an undamaged in -- Strike

19  that.  Fair market value of that vehicle being the

20  one that has been wrecked and repaired and is the

21  subject of the D.V. claim?

22     A    That would be correct.

23     Q    Or the fair market value of a vehicle that

24  has not been in an accident?

25     A    We run a C.C.C., so you know, given the

7d09ab83-7af9-42c4-9263-0b3f5f2a775b

Page 94

1   extent of the C.C.C. pool or Kelly Blue Book or

2   N.A.D.A., there's a variety of resources out there

3   that can help get you a range of what that value of

4   that vehicle could be, and so, you know, some of

5   those cars, not knowing the history of every

6   vehicle, an N.A.D.A., Kelly Blue Book or C.C.C.,

7   some of those very well could have been damaged in

8   the past and been repaired.

9          So it would be -- they could have been repaired

10  and brought up to manufacturer's recommendation

11  again or never been wrecked.  It's just the actual

12  cash value of that vehicle in an undamaged state.

13      Q   Do any of those sources have a database

14  factor that indicates whether the vehicle's been in

15  a prior accident, in other words, can you look at

16  the Kelly Blue Book value for a given vehicle that

17  has been wrecked and repaired versus one that has

18  never been in an accident?

19          MS. POWERS:   Objection.

20      A   To the best of my knowledge and I can't

21  speak on Kelly Blue Book's behalf but in my

22  engagement with the Kelly Blue Book on-line tool I

23  did not see that where you have to segment out cars

24  undamaged versus damaged.

25  BY MR. BUNCH:

7d09ab83-7af9-42c4-9253-0b3f5f2a775b

Page 95

1        Q    Right, same thing for N.A.D.A. or C.R.C.,

2   right?

3        A    Again, not being able to speak on their

4   behalf but it's been my interaction with them to the

5   best of my knowledge that you cannot segment out

6   those type of losses.

7        Q    These factors that you just ticked off

8   the -- Did they find their way into your worksheet

9   that you constructed, I guess the right word, toward

10  assessing diminished value claim in the eastern

11  region when you became a B.L.M.?

12       A    Most or many of those factors should be on

13  that spread sheet in -- just in terms of just

14  variables to look at potentially when reviewing a

15  claim for diminished value.

16   (Whereupon, Plaintiff's Deposition Exhibit No. 6

17  was marked for identification.)

18  BY MR. BUNCH:

19       Q    Mr. Kohl, you have Exhibit 6 in front of

20  you, it's -- has the same alphanumeric as the other

21  documents we've marked, this one is No. 214, it's a

22  letter dated April 20, 2007 from someone named Chris

23  Bratz, B-r-a-t-z, a Billed Claims Manager,

24  Wisconsin, slash Minnesota for American States

25  Insurance Company to a claimant for a date of loss,

7d09ab83-7af9-42c4-9253-0b3f5f2a775b

Page 131

1  Exhibit 8 to your deposition.

2       MS. POWERS: Can we make that correction on

3  the record, first, Van?

4  BY MR. BUNCH:

5       Q  We have been on a break, Mr. Kohl, during

6  that time has it occurred to you that maybe you'd

7  like to restate part of your testimony?

8       A  Yes, I would.

9       Q  And what is that?

10      A  As relates to first party handling of

11  diminished value in the state of Georgia.

12      Q  Okay.

13      A  We settle collision and I erred in A.P.

14  versus U.M.P.D. but we carry -- we handle collision

15  and U.M.P.D. exactly the same in the state of

16  Georgia, therefore a letting the cus -- letting the

17  insured know that they may be entitled to diminished

18  value after car has been repaired.

19      Q  What's A.P.D.?

20      A  Auto physical damage, third party.

21      Q  Oh?

22      A  We call it A.P.D.

23      Q  Did you confirm that with somebody else or

24  did you just realize you had misspoke?

25      A  I misspoke and then confirmed with one of

7d09ab83-7af9-42c4-9253-0b3f5f2a775b

Page 132

1  my unit leaders or one of my F.C.O.'s.

2      Q   In Georgia then, do you have a system in

3  place to capture data, whether it's on a work sheet

4  like Exhibit 7 or otherwise that relates to U.M.P.D.

5  claims?

6      A   We do not systematically track U.M.P.D.

7  claims in Georgia, however, they are addressed in

8  every single first party claim and then paid

9  accordingly if D.V. is owed.

10     Q   No, I mean you have Exhibit 7 here which

11  you constructed in the first place in the hopes of

12  providing a baseline or database from which to

13  collect the information on diminished value --

14     A   Yes.

15     Q   -- losses and payments on a going forward

16  basis, is this Exhibit 7 -- is the information

17  contained on Exhibit 7 type worksheet for U.M.P.D.

18  claims in the state of Georgia collected for roll-up

19  purposes anywhere?

20     A   They would be --

21        MS. POWERS:  Objection.

22     A   They would use this form across all parts

23  of my eastern half under my management in terms of

24  assessing the diminished value.  It can be one of

25  many things that they take into consideration in the

7d09ab83-7af9-42c4-9253-0b3f5f2a775b

Page 133

1   state of Georgia as with any other state for

2   diminished value.

3 BY MR. BUNCH:

4        Q    What I mean is there's no separate database

5   of D.V. claims being compiled for management's use

6   in analyzing diminished value claims generally,

7   based on the experience in Georgia?

8        A    To the best of my knowledge there is no

9   separate database that tracked diminished value in

10  the state of Georgia.

11       Q    So just like in any other state in your

12  sphere of influence at Safeco the F.C.O. would have

13  these documents if they used that and I mean it is

14  in their My Documents folder?

15            MS. POWERS:   Objection.

16 BY MR. BUNCH:

17       Q    The Exhibit 7 document.

18       A    The F.C.O. may or may not collect those,

19  but the unit leader and I can't speak for every unit

20  leader in that southeast region may have those on

21  their laptop and then discuss it with the unit

22  leader, transpose this document into an E-mail or

23  Word document, so it wouldn't be that particular

24  Excel document that they'd use sometimes.

25       Q    Is this Exhibit 7 document in use in the

7d09ab83-7af9-42c4-9253-0b3f5f2a775b

Page 184

1 propounded to and the answers given by said witness,

2 and that the signature is not being waived by

3 agreement of witness and all parties.

4

5          I further certify that I am neither

6 attorney nor counsel for nor related nor employed by

7 any of the parties to the action in which this

8 deposition is taken; further, that I am not a

9 relative or employee of any attorney or counsel

10 employed by the parties hereto or financially

11 interested in this action.

12

13          IN WITNESS WHEREOF, I have hereunto

14 subscribed my name on this the 17th day of December

15 2009.

16

17

18          _____

19                    TOD MINNIGERODE

20                    Certified Court Reporter,

21                    State of Missouri

22

23

24

25

7d09ab83-7af9-42c4-9253-0b3f5f2a775b

# EXHIBIT A-3

UNITED STATES DISTRICT COURT
IN AND FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MARTIN HOVENKOTTER,

    Plaintiff,

v.

SAFECO Insurance Company
of Illinois,

    Defendant.

No.: 2:09-CV-00218-JLR

## EXPERT WITNESS REPORT OF STEPHEN D. PROWSE, Ph.D, CFA

### I.  QUALIFICATIONS

1.  I am a Senior Managing Director in the Forensic and Litigation Services Practice at
FTI Consulting, Inc. ("FTI").  I received my B.A. in economics from Cambridge
University, Cambridge, England in 1982, my M.S. in economics from the California
Institute of Technology in 1984, and my Ph.D in economics from the University of
California at Los Angeles in 1989.  In addition, I am also a CFA Charterholder.
Attached as Exhibit 1 is a copy of my current resume, including a listing of
publications I have authored.  I have authored over 20 articles on economic and
financial issues that have been published in peer-reviewed academic journals,
books, and other outlets.  I have also served as a referee for numerous academic

- 1 -

research journals such as the *Journal of Finance, Journal of Financial Economics,* and the *Journal of Banking and Finance*. Attached as Exhibit 2 is a list of my trial and deposition testimony experience for the last four years. My business address is FTI Consulting, Inc., 2001 Ross Avenue, Suite 400, Dallas, Texas, 75201. FTI's rate for my work performed in this matter is $630 per hour. FTI's fees are not contingent in any way on the outcome in this matter.

2. FTI is a multi-disciplined consulting firm that provides a variety of financial advisory services to corporate clients in the U.S. and abroad. The Forensic and Litigation Services Practice specializes in providing financial, valuation, accounting, statistical, economic, and investigative consulting services to clients.

3. One of my responsibilities at FTI is to provide economic, statistical, valuation, financial, and damage quantification consulting services to clients. I have provided dispute advisory consulting and/or expert witness services in fraud, securities-related, wrongful termination, antitrust, breach of contract, intellectual property, and class certification cases. I have been qualified as an expert to testify regarding damages in numerous matters. I have also been qualified to testify as an expert on class certification issues including being qualified as a class certification expert in federal court. In addition, I have significant experience in analyzing the market for used vehicles. In particular, I have studied the market for used vehicles, how the price of used vehicles is determined, and the information sources that are available to value used vehicles. Prior to joining FTI, I was a Principal (Partner) in the Dallas

- 2 -

office of the Forensic Practice at KPMG LLP, where I provided similar services to clients.

4. Prior to my consulting career, I was employed by the Federal Reserve Bank of Dallas as a Senior Economist and Policy Advisor (1994-1998) and by the Board of Governors of the Federal Reserve System in Washington DC (1989-1994) as an Economist. I have also served as a Consultant Economist to the Bank for International Settlements (BIS) in Basel, Switzerland. In these positions I provided economic and financial analysis and policy advice to the Chairman of the Federal Reserve Board, the President of the Federal Reserve Bank of Dallas, and the Director of Research at the BIS. I have also served as an Adjunct Professor at the Cox School of Business, Southern Methodist University (1998) where I taught finance and currently serve as a guest lecturer in economics and finance. I started my career as a full-time economic consultant in 1998.

## II. ASSIGNMENT

5. I have been retained by Counsel for Defendant Safeco Insurance Company of Illinois ("Safeco") in the matter of Martin Hovenkotter, et al. v. Safeco Insurance Company of Illinois. It is my understanding that Plaintiff alleges that Safeco had a "uniform and common practice of failing to appraise its UIM policyholders' damaged vehicles for diminished value loss, inform its policyholders of their

- 3 -

diminished value loss and pay all damages their insureds are legally entitled to recover."[1]

6. According to the Plaintiff's Response to Defendant's First Set Interrogatories to Plaintiff Martin Hovenkotter, inherent diminished value ("DV") is defined as:

> The difference between an undamaged vehicle and the same vehicle after damaged and repaired.[2]

7. Counsel for Defendant has asked me to examine the issues related to class certification in this matter. In particular, I have been asked to focus on a proposed class with the two following definitions:

> All insureds of Safeco who, from and after February 18, 2003: (1) Were paid under the underinsured/uninsured motorist ("UIM") coverage provisions of their policy with Safeco, or (2) Had underinsured/uninsured motorist property damage coverage and were involved in an accident with a hit-and-run motorist, but received payment under Safeco's collision or comprehensive coverage, and (3) Who were not compensated for diminished value.[3]

Alternatively, the Plaintiffs seek certification for the following class:

> All insureds of Safeco who, from and after February 18, 2003: (1) Were paid under the underinsured/uninsured motorist ("UIM") coverage provisions of their policy with Safeco, or (2) Had underinsured/uninsured motorist property damage coverage and were involved in an accident with a hit-and-run motorist, but received payment under Safeco's collision or comprehensive coverage, and (3) Who were not compensated for diminished value, where (a) the estimate, including supplements, to repair the vehicle was more than $1,000; (b) the vehicle suffered structural (frame) damage and/or required body or

---

[1] Plaintiff, Martin Hovenkotter's Class Action Complaint for Specific Performance or Damages, Declaratory and Injunctive Relief Resulting From Breach of Contract and Violations of the Consumer Protection Act and Demand for Jury Trial. pp. 6 – 7.
[2] Plaintiff's Response to Defendant's First Set Interrogatories to Plaintiff Martin Hovenkotter. p. 4.
[3] Plaintiff, Martin Hovenkotter's Class Action Complaint for Specific Performance or Damages, Declaratory and Injunctive Relief Resulting From Breach of Contract and Violations of the Consumer Protection Act and Demand for Jury Trial. p. 7.

- 4 -

paint work; and (c) the vehicle was less than six years old (model year plus five) and had less than 90,000 miles on it at the time of the accident.[4]

8.  For the purposes of this report only, I have been asked to assume that the acts of the Defendant occurred as alleged in the complaint. It is my understanding that the named Plaintiff is Martin Hovenkotter.[5]

### III. DOCUMENTS AND INFORMATION REVIEWED

9.  The documents I have reviewed in performing my analysis include:

a.  certain legal documents (e.g., Class Action Complaint for Specific Performance or Damages, Declaratory and Injunctive Relief Resulting From Breach of Contract and Violations of the Consumer Protection Act and Demand for Jury Trial, Plaintiff's Response to Defendant's First Set Interrogatories to Plaintiff Martin Hovenkotter, etc.);

b.  the depositions of Martin Hovenkotter and Safeco Employees (e.g., Toby Rollins, Michael Stave, and Scott Kohl);

c.  documents produced by Safeco (e.g., Martin Hovenkotter's claim file); and,

d.  discussions with Michael Stave.

Attached as Exhibit 3 is a complete listing of the documents I have reviewed in this matter.

---

[4] Plaintiff, Martin Hovenkotter's Class Action Complaint for Specific Performance or Damages, Declaratory and Injunctive Relief Resulting From Breach of Contract and Violations of the Consumer Protection Act and Demand for Jury Trial. p. 8.
[5] Plaintiff, Martin Hovenkotter's Class Action Complaint for Specific Performance or Damages, Declaratory and Injunctive Relief Resulting From Breach of Contract and Violations of the Consumer Protection Act and Demand for Jury Trial. p. 1.

- 5 -

## IV. SUMMARY OF OPINIONS

10. Based upon my review of the above-mentioned materials, I have concluded that neither the fact of injury, nor damages in this matter can be determined by common proof, and that an examination of the specific claims made by each policyholder is required.   Even if some individuals in the proposed class suffered economic damages (injury) as alleged, it would not be possible to generalize those individual injuries and damages on a class-wide basis, since the factors that influence the impact on each individual and each individual's claim vary greatly.   Consequently, different policyholders would have been harmed by the alleged actions of the Defendant, if at all, in very different manners and amounts.   In particular, it is likely that some policyholders have <u>benefited</u> as a result of their vehicles being repaired after a collision, if those repairs improved the vehicle's overall condition relative to its pre-collision condition.

11. In what follows, I first discuss the individualized process by which Safeco evaluates an individual's diminished value claim.   I then examine the economic issues related to class certification.

## V.  SAFECO'S PROCESS FOR EVALUATING DIMINISHED VALUE

12. The assessment of diminished value ("DV") is inherently subjective and requires an individualized inquiry into all relevant and available information on a claim by claim basis.   It is my understanding that if a Safeco policyholder makes a claim

- 6 -

under his Uninsured Motorist Property Damage ("UMPD") coverage and asks a claims adjuster about the existence of damages for diminished value, Safeco will investigate that DV claim. Once a diminished value claim has been raised by a policyholder, the claim gets passed to a Safeco designated diminished value handler who then works in conjunction with the corresponding unit leader, field claims office manager and a Vice President and Manager of Auto Physical Damages Liberty Mutual Agency Markets Claims, to resolve the claim.[6] Safeco will have the policyholder's vehicle reappraised to ensure that the repairs were performed properly.[7]

13. It is my understanding that if it is determined that the policyholder's vehicle was not repaired properly, Safeco, at their expense, will work alongside the policyholder under their President's Guarantee program to ensure that policyholders are satisfied with their repairs. This program is offered by Safeco to first and third party claimants who have their vehicle repaired at one of Safeco's preferred vehicle repair shops and covers all work performed by any of Safeco's preferred repair shops.[8] Safeco will work with the vehicle repair shop to ensure all that can be done has been done to bring the vehicle back to its pre-loss condition.[9] This program is offered by Safeco to ensure each vehicle is repaired properly and to the satisfaction of the

---

[6] Deposition of Toby Rollins dated January 14, 2010, pp. 11 – 12.
[7] Deposition of Scott Kohl dated December 15, 2009, pp. 41 – 42.
[8] Based on my discussion with Michael Stave on February 18, 2010, it is my understanding that Safeco has a specific list of preferred auto shops in its network. If repairs are performed by any shops on this list, the repairs are covered under the President's Guarantee.
[9] Deposition of Scott Kohl dated December 15, 2009, p. 52.

- 7 -

policyholder and also to make certain there is no repair-related diminished value to the vehicle.[10]  After the policyholder is satisfied that there is not any repair-related diminished value to the vehicle, the policyholder is asked if they would still like to pursue a DV claim.[11]  If the policyholder desires to pursue a DV claim Safeco will ask the policyholder to provide support of why their vehicle has lost diminished value.[12]

14. I understand that Safeco has a uniform set of principles that it applies to evaluating a DV claim.  However, given the different circumstances that each individual claim presents, this can result in Safeco employing different methods to evaluate DV depending on the individual facts and circumstances of each claim.  For example, I understand that when a policyholder initially asserts an amount for diminished value to their adjuster, the methodology used by the policyholder to evaluate the DV and the resulting assessment of DV can vary greatly from one policyholder to another.  For example, some policyholders believe their vehicle suffered diminution of value when they are unable to sell their repaired vehicle for their desired price[13] after disclosing the vehicle's prior damage.[14]  In this case, the policyholder may provide information to support their estimate of diminished value to the Safeco adjuster

---

[10] Based on my discussion with Michael Stave on February 18, 2010, I understand this program is not available to claimants who choose to have their vehicle repaired at a repair shop that is not a Safeco preferred vehicle repair shop.

[11] Deposition of Scott Kohl dated December 15, 2009, p. 43.

[12] Deposition of Scott Kohl dated December 15, 2009, p. 43.

[13] I note that there are many market factors that affect the sales price of a vehicle, and thus if a vehicle is sold for less than the seller's desired price this does not necessarily mean that the vehicle suffered DV. An individualized inquiry is necessary to determine whether the lower price is due to the fact that vehicle has been in a prior accident as opposed to some other factors.

[14] Discussion with Michael Stave on February 18, 2010.

- 8 -

involved in their claim and request DV on their vehicle.[15] Other policyholders may hire a diminished value expert and provide their expert's report to the Safeco adjuster when requesting DV on their vehicle.[16] It is my understanding that Safeco may evaluate DV using a number of different methods depending on the facts and circumstances of each claim, including hiring a diminished value expert, using the designated diminished value handler's and unit leader's experience and judgment, or involving another third party resource.

15. As a result of the highly individualized nature of each claim, I understand that at the home office level Safeco does not require its adjustors to use a specific formula to settle diminished value claims, but Safeco does train and supervise its adjustors to consider specific factors in evaluating diminished value and provides guidelines to assess the amount, if any, of diminished value damages. Unit leader and/or field claims office manager involvement and approval are required at the home office level to ensure consistency in handling DV claims. In fact, when training employees on how to evaluate a vehicle's DV, Safeco advises its unit leaders to take into account their prior claims handling experience and to exercise sound judgment.[17] It does so because no two claims are alike, and as a result each claim must be evaluated on an individual basis. By using the designated diminished value handler's and unit leader's personal experience in combination with the field claims office manager's knowledge, the claims are reviewed in depth to determine the best

---

[15] Discussion with Michael Stave on February 18, 2010.
[16] Discussion with Michael Stave on February 18, 2010.
[17] Discussion with Michael Stave on February 18, 2010.

-9-

way to assess DV for that particular claim. Types of vehicle characteristics that may factor into this decision making process include the owner of the vehicle, age, make, model, mileage, applicable state and local jurisdiction laws, the type of damage sustained (cosmetic or structural) and the pre-collision condition of vehicle. Some of the specific characteristics evaluated are the condition of the vehicle's carpet, dashboard, engine, front tires, rear tires, glass, headliner, paint, seats, sheet metal, transmission, and trim.[18] The vehicle's repair and collision history are also reviewed, along with how well any past repairs were completed and the type of damage that was sustained to the vehicle in any previous accident, either cosmetic or structural.[19]

16. Since each vehicle and circumstance involved in an accident is individual in nature, Safeco handles each DV claim individually. For example, I understand that Mr. Stave evaluated a DV claim in Oregon for a 2009 Toyota truck. The vehicle suffered repairs totaling approximately $12,000. The claimant submitted an independent appraisal report that estimated approximately $5,600 of diminished value. Safeco contracted with Vehicle Valuation Services ("VVS") to perform an independent DV assessment, and they estimated the DV to be around $3,500. Safeco decided to more than split the difference of the claimant's independent

---

[18] Job Aid: CCC Valuation Legend – Valuescope Vehicle Condition Inspection Guidelines.
[19] Discussion with Michael Stave on February 18, 2010.

- 10 -

appraisal estimate of $5,600 and the VVS estimate of $3,500 and has offered to settle the claim for approximately $4,650.[20]

17. In another instance, a Safeco claimant's 1999 Sedan with approximately 112,000 miles was involved in a minor accident causing approximately $1,500 of damage. The claimant hired the Appraisal Group of America who estimated DV of $5,000. Safeco reviewed the claim, and due to the fact that the vehicle only sustained minor damages and was an older vehicle with very high mileage, assessed that the vehicle in fact did not suffer any DV.[21]

18. These are just two examples of how Safeco evaluated a DV claim, but there are a variety of methods they could use to assess diminished value, including hiring a diminished value expert, using the designated diminished value handler's and unit leader's experience and judgment, or involving another third party resource.

## VI. EXAMINATION OF THE ECONOMIC ISSUES RELATED TO CLASS CERTIFICATION

19. Plaintiff claims he and members of the putative class have suffered damages related to Safeco's "uniform and common practice of failing to appraise its UIM policyholders' damaged vehicles for diminished value loss, inform its policyholders

---

[20] Discussion with Michael Stave on February 18, 2010.
[21] Discussion with Michael Stave on February 18, 2010.

- 11 -

of their diminished value loss and pay all damages their insureds are legally entitled to recover."[22]

20. Thus, an examination of the economic issues with respect to class certification requires an examination of whether the policyholders sustained an economic injury and, if so, whether that economic injury or the quantum of damages, as alleged by the Plaintiff, can be determined by generalized proof without reference to the specific claims made by each individual policyholder.

21. Evaluating the DV of a vehicle is an art, not a science. While there are generally accepted principles used to estimate the DV of a vehicle, there is considerable room for reasonable professionals to disagree about the precise valuation. In fact, when training employees on how to evaluate a vehicle's DV, Safeco advises its managers to take into account their prior claims handling experience and to exercise sound judgment.[23] It does so because no two claims are alike, and as a result each claim must be evaluated on an individual basis. Even if Safeco only utilized third party DV experts to evaluate DV claims (which it does not), these professionals, even with the same level of experience and expertise, will often have varying opinions regarding the diminished value of a vehicle, and consequently arrive at different estimates of a vehicle's DV.[24] In fact, Toby Rollins, Vice President and Manager of Auto Physical Damages Liberty Mutual Agency Markets Claims, stated in his

---

[22] Plaintiff, Martin Hovenkotter's Class Action Complaint for Specific Performance or Damages, Declaratory and Injunctive Relief Resulting From Breach of Contract and Violations of the Consumer Protection Act and Demand for Jury Trial. pp. 6 – 7.
[23] Discussion with Michael Stave on February 18, 2010.
[24] Discussion with Michael Stave on February 18, 2010.

- 12 -

deposition that he has "yet to see two appraisers on the same vehicle have the same value."[25]

22. Thus, the estimation of a vehicle's DV is an inherently individualized process that depends upon the vehicle's year, make, model, trim package, mileage, options, pre-loss condition and the facts regarding the particular claim, all of which require individual judgment by the Safeco managers and any unbiased third party experts involved.[26]

23. In addition, the settlement process with an individual policyholder is also an inherently individualized process. The exact settlement amount and the extent to which it varies from the diminished value amount originally requested by the policyholder will depend on individualized factors, including the availability of additional information relevant for valuation, and the negotiation process between the Safeco managers, third party experts (if any) and the policyholder.

24. For these reasons, it is my opinion that there are numerous characteristics of each member of the proposed class and their individual claims that differ substantially and would materially impact the manner and degree to which they have allegedly been harmed, if they have been harmed at all. In fact, it is likely some policyholders benefited from the repair process, in the sense that after a policyholders' vehicle is repaired, the post-repair value of the vehicle as compared to the pre-accident value of the vehicle would have actually increased. In what follows, I list some of the

---

[25] Deposition of Toby Rollins dated January 14, 2010, pp. 121 – 122.
[26] Discussion with Michael Stave on February 18, 2010.

- 13 -

ways in which the proposed members of the class differ and how that materially
affects the manner and degree to which they may have been impacted, if at all, by
the alleged acts of the Defendant.

**Numerous Individualized Factors Affect the Valuation of the Policyholders' Vehicle**

25. There are numerous individualized factors that must be considered when evaluating
the amount, if any, of DV. These include but are not limited to the year, make,
model, trim package, mileage, options, pre-loss condition of the vehicle, and the
nature and extent of recent refurbishments of the vehicle. Different combinations of
these factors will have different effects on how the Safeco manager ultimately
determines the amount, if any, of DV.

26. For example, all other things held constant, the older a vehicle is the less likely a
policyholder's vehicle is to sustain DV. In addition, the older a vehicle is the lower
the amount of DV a policyholder's vehicle is likely to sustain, if any.

27. If a vehicle has substantially more or less miles than the average mileage for a
typical vehicle of the same type, this likely will have an impact on the methodology
used to estimate DV and the resulting amount of the DV determined for that vehicle,
if any.

28. Similarly, all other things held constant, if a policyholder's vehicle is in very poor
condition, it is likely the vehicle would suffer less diminution of value, if any,
compared to a vehicle that is kept in immaculate condition. When evaluating a

- 14 -

vehicle's condition, the designated diminished value handler may look at the carpets, dashboard, engine, front tires, rear tires, glass, headliner, paint, seats, sheet metal, transmission, and trim.[27] It is likely that the degrees of condition of each of these individual parts will vary greatly between vehicles. Thus the condition of a vehicle could greatly influence the methodology used to determine DV as well as the resulting amount of the DV of the vehicle, if any.

29. If the vehicle being evaluated has undergone recent repairs, the vehicle would need to be reviewed not only based on the current accident facts, but also based on the quality of the past repairs. It is possible a policyholder could have suffered repair-related diminished value due to the past repairs, which could influence how the DV is evaluated in the current claim and the value ultimately reached for the DV of the vehicle, if any.

30. Similarly, if the vehicle being reviewed for DV was in a prior accident, it is possible, all things held constant, the vehicle could have suffered a diminution of value as a result of the prior accident. This would require an individualized look into all factors to assess what DV, if any, was a result of the current claim. Thus, if a vehicle was involved in a prior accident, this would greatly influence the methodology chosen to assess the DV and also affect the DV of the vehicle, if any.

31. It is likely that different managers or third party experts, if any, involved in assessing the condition of the vehicle, even with similar levels of experience, would reach different conclusions on the DV of a vehicle, if any. The individualized

---

[27] Job Aid: CCC Valuation Legend – Valuescope Vehicle Condition Inspection Guidelines.

- 15 -

process to actually evaluate the DV -- whether by bringing the claim file and pictures to a dealership, hiring a diminished value expert, using the Product Line Manager's experience and judgment, or involving another third party resource - will all lead to using a different method to assess diminished value thus resulting in a different estimated DV of the vehicle, if any.

32. In some cases, a vehicle's value would actually <u>increase</u> as the result of repairs performed by Safeco. For example, Mr. Stave recalls an instance in which repairs to a Safeco claimant's vehicle most likely increased the value of the car. The vehicle suffered approximately $6,000 of mechanical damage as a result of an accident. The repair of the vehicle entailed having the engine and transmission replaced. In this instance, the vehicle's value would have likely <u>increased</u> as a result of the accident and the resulting replacement of the engine and transmission.[28]

33. Indeed, aside from this example there are a host of other circumstances that could lead a policyholder's vehicle to be worth more after reasonable and necessary repairs have been made to the vehicle. Indeed, any policyholder's vehicle that had unrepaired damage prior to the accident with the Safeco-insured could have increased in value after reasonable and necessary repairs have been made.

34. Thus, each of the policyholders' vehicles will have a different and individualized set of factors that influence the estimated DV (if any) of the vehicle and that will require an in-depth review of each claim file (and perhaps each vehicle) to determine the best method to assess the existence and amount, if any, of DV.

---

[28] Discussion with Michael Stave on February 18, 2010.

- 16 -

35. I understand that the plaintiff has proposed an alternative class definition which includes the following criteria: the estimate to repair the vehicles was more than $1,000; the vehicle suffered structural damage and/or required body or paint work; and the vehicle was less than six years old and had less than 90,000 miles at the time of the accident.[29] I have seen no evidence that these criteria were arrived at by anything other than arbitrary choice, and thus there appears to be no basis for concluding that vehicles that meet these arbitrarily determined criteria necessarily suffered DV. In fact, this class definition suffers from all of the above problems and does not obviate the need for a claim by claim, vehicle by vehicle individualized inquiry. There is nothing to suggest that vehicles meeting the criteria of this class definition necessarily suffered diminished value damages. Indeed policyholders' vehicles which meet these arbitrary criteria may not have suffered DV, and so an individualized inquiry would be necessary to determine the fact of injury. Even if such vehicles were determined to have suffered DV after an individualized inquiry, an in-depth review of each claim file (and perhaps each vehicle) would also be required to determine the best method to assess the amount of DV.

---

[29] Plaintiff, Martin Hovenkotter's Class Action Complaint for Specific Performance or Damages, Declaratory and Injunctive Relief Resulting From Breach of Contract and Violations of the Consumer Protection Act and Demand for Jury Trial. p. 8.

- 17 -

**The Particular Circumstances of the Named Plaintiff's Claim Highlights the Individualized Nature of Evaluating DV**

36. The particular circumstances of the named Plaintiff's claim highlight the inherently individualized nature of the entire process involved in evaluating DV. Martin Hovenkotter is an avid collector and restorer of unique vehicles.[30] Mr. Hovenkotter purchased his 2006 Mazda Speed 6 AWD from Lee Johnson Chevrolet and paid a base price of $26,899 for it.[31] When he purchased the car in September of 2006 it was brand new.[32]

37. On January 11, 2007, Mr. Hovenkotter's vehicle was involved in a hit-and-run accident in Issaquah, Washington.[33] It's important to note that there was no police report available to document the accident or the condition of Mr. Hovenkotter's damaged vehicle on the day of the accident.[34] On February 5, 2007, Mr. Hovenkotter took his Mazda to Haury's Auto Shop, which was not an accepted Safeco preferred repair shop under Safeco's President's Guarantee program, and received an estimate for the repairs.[35] Jeff Butler, the owner of Haury's auto shop indicated that the Mazda had very light damage, but the frame was bent and would need to be straightened.[36] Haury's auto shop also performed a paint job on the front

---

[30] Deposition of Martin Hovenkotter dated November 13, 2009, pp. 43 – 45.
[31] Deposition of Martin Hovenkotter dated November 13, 2009, p. 65 and Hovenkotter0071.
[32] Hovenkotter0071.
[33] Deposition of Martin Hovenkotter dated November 13, 2009, pp. 75 – 78.
[34] Deposition of Martin Hovenkotter dated November 13, 2009, p. 77.
[35] Deposition of Martin Hovenkotter dated November 13, 2009, pp. 80 – 81 and Hovenkotter0061.
[36] Deposition of Martin Hovenkotter dated November 13, 2009, pp. 18 and 94.

- 18 -

of Mr. Hovenkotter's Mazda and blended the paint to match the rest of the car.[37] Mr. Hovenkotter paid for the repairs (totaling $2,874) out of pocket directly to Haury's auto shop.[38]  It was not until February 26, 2007 that Mr. Hovenkotter's vehicle was actually repaired, and the following day he contacted Safeco, regarding the accident that had occurred nearly a month and a half prior, to open a claim.[39] Mr. Hovenkotter never asked Safeco to evaluate a diminution of value claim.

38. Mr. Hovenkotter believed his vehicle suffered approximately $11,000 of diminution of value because he was not able to sell his vehicle for the price he believed it was worth.[40]  Mr. Hovenkotter listed his Mazda online for sale on Auto Trader and Craig's List in July of 2007.[41]  In his deposition Mr. Hovenkotter indicated that his Mazda did not look, drive or function any differently after the repairs were completed than it had prior to the accident,[42] but after about only four weeks of attempting to sell it on Auto Trader and Craig's List for $23,000, he accepted an offer for his vehicle of $18,500.[43]  Mr. Hovenkotter did not include any information in his ad regarding the accident, but when an interested party contacted him he indicated that he disclosed the accident. It is interesting to note that despite this

---

[37] Deposition of Martin Hovenkotter dated November 13, 2009, pp. 126 – 127.
[38] Deposition of Martin Hovenkotter dated November 13, 2009, p. 93.
[39] Deposition of Martin Hovenkotter dated November 13, 2009, pp. 80 and 96.
[40] Deposition of Martin Hovenkotter dated November 13, 2009, pp. 130 – 131.
[41] Deposition of Martin Hovenkotter dated November 13, 2009, p. 117 and Hovenkotter0001.
[42] Deposition of Martin Hovenkotter dated November 13, 2009, p. 97.
[43] Deposition of Martin Hovenkotter dated November 13, 2009, pp. 110 – 112 and Hovenkotter0001.

information not being included in the advertisement for his Mazda, only two or three people responded to Mr. Hovenkotter's advertisement.[44]

39. I also note, that a CARFAX Vehicle History Report pulled in October 2009 on Mr. Hovenkotter's Mazda indicated that the vehicle had not been involved in any accidents.[45]

40. There are numerous characteristics of Mr. Hovenkotter's claim that illustrate the individualized nature of evaluating DV. Mr. Hovenkotter's vehicle was a brand new, high-performance, very rare, Mazda Speed 6 AWD and was in excellent condition. These factors will clearly influence whether in fact his vehicle suffered diminished value, and if so, what the amount of that diminished value is.

**The Particular Circumstances of the Named Plaintiff's Claim Make it Clear He is Not Representative of the Class**

41. Many characteristics of Mr. Hovenkotter's claim make it clear he is not representative of the proposed class. His car, a 2006 Mazda Speed 6 AWD, was a new vehicle with low mileage and was also a high-performing and very rare vehicle.[46] There is nothing to suggest that the vehicles meeting the class definition are similar to Mr. Hovenkotter's vehicle. A 5-year old, average or low-end vehicle with 80,000 miles on it cannot be evaluated on the same spectrum as a newer, unusual vehicle with low mileage. Therefore it is likely that any method used to

---

[44] Deposition of Martin Hovenkotter dated November 13, 2009, pp. 48 – 49 and 112.
[45] www.carfax.com.
[46] Deposition of Martin Hovenkotter dated November 13, 2009, p. 46.

- 20 -

calculate DV for Mr. Hovenkotter's Mazda would be far different than the methods that could be used to evaluate the alleged DV of other policyholders' vehicles.

42. Mr. Hovenkotter's Mazda was also in pristine condition. He was an avid collector who had bought and sold over 35 cars in his lifetime and was only interested in vehicles with the original paint and in the same condition they were when they came out of the factory.[47] Up until the accident, Mr. Hovenkotter also waxed his Mazda once a month and washed it once a week.[48] A majority of the vehicles driven by members of the proposed class were most likely not maintained in the same condition that Mr. Hovenkotter kept his Mazda. Thus, the condition of Mr. Hovenkotter's vehicle is likely not representative at all of the proposed class as a whole.

43. Mr. Hovenkotter's claim underscores the dynamic and unique nature of how DV claims are determined. Examined in detail, Mr. Hovenkotter's claim is unique.

44. The facts regarding Mr. Hovenkotter's claim illustrates how it is very individualized in nature and thus not representative of the proposed class as a whole. Also, this claim shows that the process of evaluating the DV of a vehicle is, in fact, an art, not a science. In any claim scenario, it should be recognized that there are always differing points of view that ultimately are resolved through the claims process.

---

[47] Deposition of Martin Hovenkotter dated November 13, 2009, pp. 39 and 58.
[48] Deposition of Martin Hovenkotter dated November 13, 2009, p. 127.

**The Plaintiff's Expert's Vehicle Evaluation Report Illustrates the Individualized Nature of Each Claim**

45. Plaintiff's counsel retained Darrell Harber to evaluate the amount of inherent diminished value Mr. Hovenkotter's vehicle suffered due to being in a hit and run accident. Mr. Harber is of the opinion that "inherent diminished value occurs whenever a vehicle suffers damage which includes any of the ten areas I have identified."[49]   These ten areas include: Frame/Unibody Damage, Major Front Structural Components, Bolted on Major Body Panels, Welded on Major Body Panels, Major Suspension Components, Supplemental Restraint Systems, Aftermarket Major Body Replacement Parts, Used/Salvage Major Body Replacement Parts, Vehicle Warranty and Refinished Body Panels.[50]  Mr. Harber provides no basis for his opinion that every vehicle that has been in an accident and suffers damage in any of these areas suffers DV.    In fact there is empirical evidence to the contrary as discussed above. It is likely that many policyholders benefited from the repair process, in the sense that after their vehicle was repaired, the post-repair value of the vehicle as compared to the pre-accident value of the vehicle increased.  Mr. Harber reached the conclusion that Mr. Hovenkotter's vehicle suffered damage in five of these ten areas based on his review of Mr. Hovenkotter's repair invoice.[51]   In order to calculate the amount of inherent diminished value Mr. Harber determined the Pre-Loss Vehicle Value and the Post

---

[49] Hovenkotter0044.
[50] Hovenkotter0046 – 47.
[51] Hovenkotter0046 – 47.

- 22 -

Accident Vehicle Value of Mr. Hovenkotter's vehicle. Mr. Harber determined a Pre-Loss Value of between $22,538.75 and $24,911.25 for Mr. Hovenkotter's vehicle by reviewing NADA Guides.[52] Mr. Harber determined a Post Accident Value of $21,352 for Mr. Hovenkotter's vehicle based on the type and location of the repairs.[53] Thus, Mr. Harber reaches the conclusion that Mr. Hovenkotter's vehicles suffered diminution of value in the amount of $2,372.[54]

46. Mr. Harber's report illustrates the fact that an in-depth review of each claim file will be required to determine the amount of DV suffered by the proposed class members. In order to reach his conclusion, Mr. Harber obtained specific information regarding Mr. Hovenkotter's vehicle in order to determine the proper value using the NADA Guides. In addition, Mr. Harber reviewed the specific details of the repair invoice to determine the diminution of value of Mr. Hovenkotter's vehicle. These types of information would only be available by performing an in-depth review of Mr. Hovenkotter's claim file.

47. Mr. Harber's report also highlights how the subjective process of calculating DV can lead to individuals reaching vastly different conclusions on the amount of DV suffered for the same claim. Mr. Hovenkotter's estimate on the amount of DV his vehicle suffered in the accident ($11,000) is over four times the amount of DV Mr. Harber's concluded in his report ($2,372).

---

[52] Hovenkotter0045.
[53] Hovenkotter0045.
[54] Hovenkotter0045.

- 23 -

48. In addition, Mr. Harber provides no basis for his opinion that every vehicle that has been in an accident and meets the arbitrary criteria in the proposed alternative definition of the class suffered DV.   In fact there is empirical evidence to the contrary as discussed above.  It is likely that many policyholders (including those that meet the arbitrary criteria in the alternative class definition) benefited from the repair process, in the sense that after their vehicle was repaired, the post-repair value of the vehicle as compared to the pre-accident value of the vehicle increased.

**Conclusion**

49. Based upon my review of the above-mentioned materials, I have concluded that neither the fact of injury, nor damages for proposed class members can be determined by generalized proof and that an examination of the specific claims made by each individual policyholder is required.  Even assuming that some individuals in the proposed class suffered economic damages as alleged, it is not possible to generalize those individual experiences and damages on a class-wide basis, since the factors that influence the impact on each individual and each individual's damages claim vary greatly.  Consequently, different individual policyholders would have been harmed, if at all, in very different manners and amounts by the alleged actions of the Defendant.  Indeed, it is likely a significant number of individuals in the proposed class benefited from the repair process, in the sense that after a policyholders' vehicle is repaired, the post-repair value of the vehicle as compared to the pre-accident value of the vehicle could have increased.

- 24 -

50. The inherent individualized nature of evaluating DV for a vehicle is consistent with a Directive filed December 1, 2008, by The Insurance and Safety Fire Commissioner of Georgia, John Oxendine. Mr. Oxendine stated that "defining the amount of loss associated with diminution of value is a subjective process where even experts can have a difference of opinion" stating that "[e]ach claim is unique" and "[t]otal reliance on one particular formula or method in making that evaluation may not be appropriate given the subjective nature of the claim."[55] For this reason, the Department of Insurance, Safety and Fire for Georgia "has not endorsed a particular formula or method" for calculating diminution of value.[56]

---

[55] Directive from Office of Insurance and Safety Fire Commissioner to all Property and Casual Companies Licensed to Conduct Business in the State of Georgia. December 1, 2008. (Directive-1222008-1058)
[56] Directive from Office of Insurance and Safety Fire Commissioner to all Property and Casual Companies Licensed to Conduct Business in the State of Georgia. December 1, 2008. (Directive-1222008-1058)

- 25 -

* * * * *

My analyses, opinions, and conclusions are based on the analysis performed by me, and those under my direction, through the date of this report. It is my understanding that discovery in this matter may be supplemented through the date of trial. I reserve the right to supplement or modify my opinions should additional relevant information become available.


Stephen D. Prowse, Ph.D, CFA
Dallas, Texas
February 19, 2010

- 26 -



Exhibit 1

## Stephen D. Prowse, Ph.D, CFA

Senior Managing Director

**Dallas**

2001 Ross Avenue,
Suite 400
Dallas, TX 75201

Tel (214) 397-1696
Fax (214) 397-1785

Stephen.prowse@fticonsulting.com

## Employment

1989-1994: Economist, Federal Reserve Board

1992-1993: Economist, Bank for International Settlements
(on leave from FRB)

1994-1998: Senior Economist & Policy Advisor, Federal
Reserve Bank of Dallas

1997-1998: Adjunct Professor, Southern Methodist
University

1998-2000: Director, PricewaterhouseCoopers LLP

2000-2003: Principal, KPMG LLP

2003-present: Senior Managing Director, FTI Consulting,
Inc.

## Background

Stephen Prowse is a Senior Managing Director in FTI Consulting, Inc.'s Forensic practice in Dallas, where
he provides economic, financial, statistical and valuation analysis to clients involved in litigation,
arbitration, mediation and other contexts where parties are engaged in complex business disputes. He
specializes in providing advisory and expert witness services to clients involved in antitrust, intellectual
property, securities, valuation, and lost profits matters. He has offered expert testimony in all of these
areas.

Dr. Prowse's clients represent the Financial Services, Retail, Manufacturing, Oil and Gas, Healthcare,
Trucking and Transportation, Consumer Goods, Auto and Telecommunications Industries.

Dr. Prowse has a Ph.D in economics from UCLA and is a CFA Charterholder. Prior to joining FTI, Dr.
Prowse was a Partner (Principal) in KPMG LLP's Forensic Practice. Prior to his consulting career, Dr.
Prowse was a Senior Economist and Policy Advisor in the Federal Reserve System, where he provided
economic and financial policy advice to the Chairman of the Federal Reserve Board and the President of
the Federal Reserve Bank of Dallas on economic and financial matters. He has also served as an
Adjunct Professor at the Cox School of Business, Southern Methodist University. He has published
numerous articles in, and has served as a referee for, academic research journals such as the *Journal of
Finance*, *Journal of Financial Economics* and *Journal of Banking and Finance*.



Exhibit 1

**Selected Engagement Experience**

<u>Securities/Fraud</u>

Dr. Prowse has extensive experience in assessing damages in securities-related cases, including 10b-5 class action lawsuits. He has valued corporate equities, bonds, futures, options and other derivative securities in a litigation context. He has performed event studies, developed appropriate peer groups, and isolated economy-wide, industry-specific and company-specific factors impacting a company's stock price. He has constructed probabilistic financial trading models to track "ins-and-outs" traders and retention shareholders. He has also valued both public and private firms in the retail, mining, trucking, energy and sports-related industries.

<u>Antitrust</u>

Dr. Prowse has provided advisory services to clients involved in antitrust litigation. He has performed studies to define the relevant market, assessed the competitive attributes of markets, performed pricing studies, estimated price elasticities of demand and supply, analyzed markets in competitive, monopolistic and oligopolistic environments, and estimated damages. He has also evaluated the competitive attributes of markets and firm's business practices to assess the firm's vulnerability to antitrust lawsuits.

<u>Intellectual Property</u>

Dr. Prowse has assessed economic damages and defined the market in intellectual property matters, including patent infringement, copyright and trade secrets cases. He has calculated reasonable royalties, lost profits, lost convoyed sales, damages through price erosion and unjust enrichment in such cases. He has also offered expert testimony in such matters.

<u>Statistical and Econometric Analysis</u>

Dr. Prowse has provided statistical analysis to clients involved in many types of disputes. He has experience in applying statistical, sampling, econometric, and regression principles in determining lost profits in breach of contract suits, lost wages and lost commissions in wrongful termination suits, and damages in antitrust and intellectual property disputes.

**Education & Professional Affiliations**

Dr. Prowse holds a Ph.D in economics from UCLA and is a CFA Charterholder. He is a member of the American Economic Association, the American Finance Association, and the CFA Institute.



Exhibit 1

**Business and Academic Publications**

"Dura's Impact on Damages", with Peri Nielsen, <u>Insights The Corporate & Securities Law Advisor</u>, Volume 22 Number 7, July 2008.

"Measuring Market Power in the Steel Industry", with Dan Slottje and Esfandiar Maasoumi, in <u>Measuring Market Power</u>, D.J. Slottje (ed.), Elsevier Science B.V. 2002.

"Antitrust Policy in Mexico", with Dan Slottje, <u>Law and Business Review of the Americas</u>, Summer 2001.

"The Private Equity Market", with George Fenn and Nellie Liang, in <u>The Handbook of Corporate Finance</u>, 2002.

"Angel Investors and the Angel Capital Electronic Network (ACE-Net)", with Zoltan Acs, in <u>Bridging the Entrepreneurial Financing Gap:  Linking Government with Regulatory Policy</u>, Michael J. Whincop (ed.), Sydney:  Federated Press 2001.

"Trends and Prospects in Venture and Angel Investments in New Media Companies", working paper, 2000.

"Shareholder Litigation against Boards of Directors," co-authored with Larry Ranallo, in Weil, Wagner and Frank (eds.), <u>Litigation Services Handbook:  The Role of the Financial Expert</u>, 3rd edition (Wiley, NY).

"Corporate Governance and Corporate Finance in East Asia:  What can we Learn from the Industrialized Countries?"  <u>Banker's Journal Malaysia</u>, March 1999.

"Corporate Governance:  Emerging Issues and Lessons from East Asia", <u>World Bank Discussion Paper #24</u>, 1998.

"Corporate Control in Commercial Banks", <u>The Journal of Financial Research</u>, 1997.

Alternative Models of Financial System Development", in Edey (ed.) <u>The Future of the Financial System</u>, Proceedings of the 1996 Conference of the Reserve Bank of Australia.

"Corporate Governance in Eastern Europe and Russia:  The Role of Banks" with Peter Dittus, in Gray, Rapaczinski, and Stern, <u>Corporate Governance in the Transition Countries</u> (1995:  Blackwell).

"Corporate Finance and Governance in an International Perspective:  A Survey of Corporate Control Mechanisms Among Large Firms in the U.S., U.K., Japan and Germany", <u>Financial Markets, Institutions and Instruments</u>, Volume 4 Number 1,1995.

 F T I

Exhibit 1

"The Structure of Corporate Ownership in Japan", The Journal of Finance, 47 (3), 1992.

"Institutional Investment Patterns and Corporate Financial Behavior in the U.S. and Japan", The Journal of Financial Economics, 27 (1), 1991.

"Angel Investors and the Market for Angel Investments", The Journal of Banking and Finance, August 1998.

"Innovation and Finance in High-Tech Firms", with George Fenn and Nellie Liang, working paper presented at the Innovation and Finance Conference at Columbia Law School, December 1997.

"An Economic Analysis of the Private Equity Market", with George Fenn and Nellie Liang, Financial Markets, Institutions and Instruments, Volume 6, Number 4, 1997.

"The Economics of the Private Placement Market:  A New Look", with Mark Carey, John Rea, and Greg Udell, Financial Markets, Institutions and Instruments, Volume 2 Number 3, 1993.

"A Look at America's Corporate Finance Markets", The Southwest Economy 2, 1996.

"Exploring Aggregate Asset Price Fluctuations Across Countries:  Measurement, Determinants and Monetary Policy Implications", with Claudio Borio, Bank for International Settlements Economic Paper, No. 40, 1994.

"Recent Developments in Corporate Finance", with John Rea, Lee Crabbe, and Mark Warshawsky, Federal Reserve Bulletin, August 1990.



Exhibit 2

## STEPHEN D. PROWSE

### DEPOSITION TESTIMONY

AIG Retirement Services, Inc.* (formerly known as SunAmerica Inc.), a Delaware corporation, v. Altus Finance S.A., a corporation organized under French law, et. al., Case No.: CV-05-1035 JFW (United States District Court, Central District of California, Western Division) (February 2007)

Corey Airport Services, Inc., and William E. Corey, Plaintiffs, v. The City of Atlanta, Clear Channel Outdoor, Inc.* d/b/a Clear Channel Airports, Clear Channel Airports of Georgia, Inc., f/k/a Transportation Media, Inc. et al., Civil Action No. 1:04-CV-3243 (In the United States District Court for the Northern District of Georgia, Atlanta Division) (May 2007)

Fair Isaac Corporation*, Plaintiff, vs. Texas Mutual Insurance Company, Defendant, Case No. 4:05-CV-03007 (In the United States District Court for the Southern District of Texas, Houston Division) (June 2007)

Avago Technologies General IP PTE Ltd. and Avago Technologies ECBU IP Ltd.*, Plaintiffs, v. Elan Microelectronics Corp., a Taiwanese Corporation, and Elan Information Technology Group, a California corporation, Defendants. Case 5:04-cv-05385-JW (United States District Court, Northern District of California) (July 2007)

Mannatech, Inc. Plaintiff, v. Glycobiotics International, Inc.* Defendant. Civil No. 3-06-CV-0471-G  ECF (In the United States District Court for the Northern District of Texas, Dallas Division) (July 2007)

A. Vernon Wright and Dynoil Refining LLC, a Louisiana limited liability company, Plaintiffs, vs. Lehman Brothers Holdings Inc., Lehman Brothers Inc.*, Carlos Fierro, Jeffrey Turnbaugh, Andrew Malik et al, Defendants. No. BC366895 Related to No. BC339157 (Superior Court of the State of California, County of Los Angeles) (October 2007)

Tessera, Inc.*, Claimants and Counter-respondent vs. Amkor Technology, Inc., Respondents and Counter-claimant (International Court of Arbitration of the International Chamber of Commerce, Ref. No.: 14 268/EBS) (January 2008)

In re Petco Corporation* Securities Litigation. Case No. 05-CV-0823-H (RBB) (United States District Court, Southern District of California) (March 2008)

Net2Phone, Inc., Plaintiff, v. eBay, Inc.*, Skype Technologies SA, Skype, Inc., et al., Defendants. Case No. 06-2469-KSH-PS (United States District Court for the District of New Jersey) (June 2008)

In the Matter of Certain Semiconductor Chips with Minimized Chip Package Size and Products Containing Same (III). Tessera, Inc.*, Complainant. Investigation No. 337-TA-630 (United States International Trade Commission, Washington, D.C.) (August 2008)

Starz Entertainment, LLC*, Plaintiff v. Buena Vista Television, Inc., Defendant. Case No. CV07-01895VBF(PJWx) (United States District Court, Central District of California, Western Division) (August 2008)

Rambus Inc., Plaintiff v. Micron Technology, Inc.*, and Micron Semiconductor Products, Inc., Defendants. Case No. C06-00244 (United States District Court, Northern District of California, San Jose Division) (October 2008)



Exhibit 2

Georgia Hensley, et al, Individually and as Class Representatives on Behalf of All Similarly Situated Persons, Plaintiffs, vs. Computer Sciences Corporation, et al. Defendants. No.: CV-2005-059-3 (In the Circuit Court of Miller County, Arkansas) (December 2008)

United States Securities and Exchange Commission, Plaintiff, vs. Robert A. Berlacher*, Lancaster Investment Partners, L.P. et al., Defendants.  Civil Action No. 07-3800 – ER (In the United States District Court for the Eastern District of Pennsylvania) (March 2009)

Glazer's Wholesale Drug Company, Inc. and Glazer's Distributors of Louisiana, Inc. Plaintiffs, v. Klein Foods, Inc. d/b/a Rodney Strong Vineyards*, Defendant.  Civil Action No. 3-08CV0774-L (In the United States District Court, Northern District of Texas, Dallas Division) (April 2009)

In the Matter of Certain Mobile Telephones and Wireless Communication Devices Featuring Digital Cameras, And Components Thereof.  Eastman Kodak Company*, Complainant. Investigation No. 337-TA-663 (United States International Trade Commission, Washington, D.C.) (July 2009)

In the Matter of Certain Digital Cameras.  Eastman Kodak Company*, Respondent. Investigation No. 337-TA-671 (United States International Trade Commission, Washington, D.C.) (August 2009)

Retained by party indicated by a *.

                                                    Exhibit 2

## STEPHEN D. PROWSE

### TRIAL/ARBITRATION TESTIMONY

United States Securities and Exchange Commission*, Plaintiff -v- Bruce E. Snyder, Jr.,
Defendant, Civil Action No. H-03-4658 (United States District Court, Southern District of
Texas, Houston Division) (July 2006)

Dan K. Johnson and Sherri K. Johnson, Claimants, vs. Sam A. Mudlin and Merrill Lynch,
Pierce, Fenner & Smith, Inc.*, Respondents. (National Association of Securities Dealers,
Case No.: 05-3808) (February 2007)

Tessera, Inc.*, Claimants and Counter-respondent vs. Amkor Technology, Inc., Respondents
and Counter-claimant (International Court of Arbitration of the International Chamber of
Commerce, Ref. No.: 14 268/EBS) (April 2008)

In re: Crosswinds at Lone Star Ranch 1000, Ltd., Debtor.  Case No. 08-40262 (Chapter 11)
(In the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division)
(July 2008)

In the Matter of Certain Semiconductor Chips with Minimized Chip Package Size and
Products Containing Same (III).  Tessera, Inc.*, Complainant.  Investigation No. 337-TA-630
(United States International Trade Commission, Washington, D.C.) (October 2008)

In re: Crosswinds at Lone Star Ranch 1000, Ltd., Debtor.  Case No. 08-40262 (Chapter 11)
(In the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division)
(October 2008)

In the Matter of Arbitration between American Wireless License Group, LLC, Claimant,
against Harvey P. White, Scot B. Jarvis, Susan G. Swenson, Thomas J. Bernard, Jeffrey P.
Williams, Anthony R. Chase, Michael B. Targoff, Jill E. Barad, Robert C. Dynes, James E.
Hoffman, and Stewart Douglas Hutcheson, Respondents* (American Arbitration Association
Case No. 71 181 Y 00124 07) (November 2008)

Avago Technologies General IP PTE Ltd. and Avago Technologies ECBU IP Ltd.*, Plaintiffs,
v. Elan Microelectronics Corp., a Taiwanese Corporation, and Elan Information Technology
Group, a California corporation, Defendants.  Case 5:04-cv-05385-JW (United States District
Court, Northern District of California) (April 2009)

In the Matter of Certain Mobile Telephones and Wireless Communication Devices Featuring
Digital Cameras, And Components Thereof.  Eastman Kodak Company*, Complainant.
Investigation No. 337-TA-663 (United States International Trade Commission, Washington,
D.C.) (October 2009)

Retained by party indicated by a *.

**Exhibit 3 – List of Information Considered**
*Martin Hovenkotter, et al. v. Safeco Insurance Company of Illinois*

## A.  Items Produced by the Parties

Martin Hovenkotter Safeco Claim File
Hovenkotter0001 – Hovenkotter0109

## B. Pleadings and Discovery

**Depositions:**

Deposition of Toby Rollins – 11/11/2009 and 1/14/2010

Deposition of Michael Stave – 11/12/2009 and 1/13/2010

Deposition of Martin Hovenkotter – 11/13/2009

Deposition of Scott Kohl – 12/15/2009

**Pleadings:**

Plaintiff's Response to Defendant's Second Set of Request for Production of Documents (Propounded by Defendant
    Safeco Insurance Company of Illinois) – 1/18/2009

Class Action Complaint for Specific Performance or Damages, Declaratory and Injunctive Relief Resulting From
    Breach of Contract and Violations of the Consumer Protection Act and Demand for Jury Trial – 2/18/2009

Plaintiff's Response to Defendant's First Set Interrogatories to Plaintiff Martin Hovenkotter – 9/24/2009

Plaintiff's Response to Defendant's First Set of Request for Admission to Plaintiff Martin Hovenkotter – 9/24/2009

## C.  Information from Other Sources

Discussion with Michael Stave, Field Claims Office Manager of the Northwest Region at Liberty Mutual.

Directive from Office of Insurance and Safety Fire Commissioner to all Property and Casual Companies Licensed to
    Conduct Business in the State of Georgia. December 1, 2008. (Directive-1222008-1058)

Job Aid: CCC Valuation Legend – Valuescope Vehicle Condition Inspection Guidelines

www.carfax.com

# EXHIBIT A-4

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

MARTIN HOVENKOTTER,                        )
                                           )
                    Plaintiff,             )
                                           )
         vs.                               )  No. 2:09-cv-00218 JLR
                                           )
SAFECO CORPORATION, SAFECO                 )
INSURANCE COMPANY OF AMERICA, and          )
SAFECO INSURANCE COMPANY OF                )
ILLINOIS,                                  )
                                           )
                    Defendants.            )

VIDEOTAPED DEPOSITION OF TOBY S. ROLLINS, VOL II

January 14, 2010

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square        2208 North 30th Street, Suite 202
600 University St.      Tacoma, WA 98403
Suite 2300              (253) 627-6401
Seattle, WA 98101       (253) 383-4884 Fax
(206) 340-1316          scheduling@byersanderson.com

(800) 649-2034          www.byersanderson.com

Serving Washington's Legal Community Since 1980

197b62bc-041e-44df-af2e-fa31c8bdf29c

Page 2

```
 1                  APPEARANCES

 2

 3 For the Plaintiff:

 4              Van Bunch
                Bonnett Fairbourn Friedman & Balint
 5              2901 N. Central Avenue
                Suite 1000
 6              Phoenix, AZ  85012
                602.274.1100
 7              602.274.1199 Fax
                Vanb@earthlink.net
 8

 9

10

11 For the Defendants:

12              Tiffany L. Powers
                Alston & Bird
13              1201 West Peachtree Street
                Atlanta, GA  30309-3424
14              404.881.7000
                404.253.8584 Fax
15              Tpowers@alston.com

16

17

18

19

20

21 Also present:  Chad Reilly
                Videographer, Byers & Anderson, Inc.
22              Court Reporters & Video

23

24

25
```

197b62bc-041e-44df-af2e-fa31c8bdf29c

Page 6

```
 1                    BE IT REMEMBERED that on Thursday,
 2   January 14, 2010, at 701 Fifth Avenue, Suite 3600,
 3   Seattle, Washington, at 10:01 a.m., before TERILYNN
 4   PRITCHARD, CCR, RPR, CRR, Notary Public in and for the
 5   State of Washington, appeared TOBY S. ROLLINS, the
 6   witness herein;
 7                    WHEREUPON, the following proceedings
 8   were had, to wit:
 9
10                    <<<<<< >>>>>>
11
12
13                    VIDEOGRAPHER:  We are now on the
14   record.  My name is Chad Reilly, videographer for
15   Byers & Anderson Court Reporters & Video.  Our address
16   is 2208 North 30th Street, Suite 202, Tacoma,
17   Washington 98403.  Our telephone number is
18   253-627-6401.
19       Today is January 14th, 2010, and the time is now
20   10:01 a.m.
21       This is Volume II of the videotaped deposition of
22   Toby S. Rollins being taken on behalf of the
23   plaintiffs in the case of Martin Hovenkotter, et al.
24   versus Safeco Corporation, et al.  The cause number is
25   2:09-cv-00218 JLR.
```

197b62bc-041e-44df-af2e-fa31c8bdf29c

Page 121

```
 1        I'd have to look at one of his reports, but if I
 2   remember, I didn't know that his methodology was
 3   exactly how I would have liked to see our IAs evaluate
 4   this.
 5        I think I also saw instances where his reports
 6   seemed higher than what seemed realistic or normal
 7   based on other factors that were involved in
 8   particular claims.
 9 Q  As it reflects on Exhibit No. 32 and your entry on May
10   26, 2004 to Mr. Foland, you say, "I honestly felt he
11   was adjusting to what the claimant's IA"-- independent
12   appraisers --"are presenting, not working from
13   scratch."
14        Do you see that entry, second page?
15 A  Yes, I see that.
16 Q  What criticism did you have of using someone else's
17   number and working off that number?
18 A  By the very title of them, they are independent
19   appraisers, and they should be coming up with their
20   valuations on their own methodology, merits, and
21   evidence.
22 Q  If the two appraisers have the same methodology or a
23   similar methodology, they could come up with a
24   different value though, right?
25 A  Yeah.
```

197b62bc-041e-44df-af2e-fa31c8bdf29c

Page 122

1        I have yet to see two appraisers on the same
2        vehicle have the same value.
3            There's-- a very subjective nature of these claims
4        drives these varying dollar figures.
5  Q     You say that, "Brad, you have a tremendous amount of
6        experience, and I value your knowledge greatly"--
7  A     I may have been speaking out of school there, having
8        only been with him for a few months.  We know the
9        outcome of that.
10 Q     "Together we'll build a better model.  Sometimes you
11       have to take a step back before you take a step
12       forward."
13          Do you see that reference?
14 A     Yes, I do.
15 Q     Do you think that your efforts during this time
16       ultimately led to the development of a model for
17       processing diminished value claims at Safeco?
18 A     Yes.
19 Q     And can you just, as best you can recall, describe
20       that model for us?
21 A     When we're presented with a diminished value claim, we
22       gather the information that we've discussed earlier
23       about some of the suggested factors, which can be
24       make, model, year, miles, vehicle owner, any specific
25       state statutes, maintenance history, condition, prior

197b62bc-041e-44df-af2e-fa31c8bdf29c

**Page 141**

1  STATE OF WASHINGTON )    I, Terilynn Pritchard, RPR, CRR,
                       ) ss CCR # 2047, a duly authorized
2  County of King    )   Notary Public in and for the State
                         of Washington, residing at
3                        Auburn, do hereby certify:

4

5      That the foregoing deposition of TOBY S. ROLLINS
was taken before me and completed on January 14, 2010, and
6  thereafter was transcribed under my direction; that the
deposition is a full, true and complete transcript of the
7  testimony of said witness, including all questions, answers,
objections, motions and exceptions;

8

9      That the witness, before examination, was by me
duly sworn to testify the truth, the whole truth, and
nothing but the truth, and that the witness reserved the
10  right of signature;

11     That I am not a relative, employee, attorney or
counsel of any party to this action or relative or employee
12  of any such attorney or counsel and that I am not
financially interested in the said action or the outcome
13  thereof;

14     That I am herewith securely sealing the said
deposition and promptly delivering the same to
15  Attorney Van Bunch.

16     IN WITNESS WHEREOF, I have hereunto set my hand
and affixed my official seal this 19th day of January, 2010.

17

18

19

20                _____
                Terilynn Pritchard, CCR, RPR, CRR
21               Notary Public in and for the State
                of Washington, residing at
22               Auburn.

23

24

25

197b62bc-041e-44df-af2e-fa31c8bdf29c

# EXHIBIT A-5

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

MARTIN HOVENKOTTER,                      )
                                         )
                    Plaintiff,           )
                                         )
        vs.                              ) No. 2:09-cv-00218 JLR
                                         )
SAFECO CORPORATION, SAFECO               )
INSURANCE COMPANY OF AMERICA, and        )
SAFECO INSURANCE COMPANY OF              )
ILLINOIS,                                )
                                         )
                    Defendants.          )


VIDEOTAPED DEPOSITION OF MICHAEL G. STAVE

November 12, 2009

Seattle, Washington

792d93f9-edb4-4096-ab13-27bcc522c783

Page 2

```
 1                  APPEARANCES

 2

 3 For the Plaintiff:

 4                  Van Bunch
                    Bonnett Fairbourn Friedman & Balint
 5                  2901 N. Central Avenue
                    Suite 1000
 6                  Phoenix, AZ  85012
                    602.274.1100
 7                  602.274.1199 Fax
                    Vanb@earthlink.net
 8
                    David A. Futscher
 9                  Parry Deering Futscher & Sparks
                    411 Garrard Street
10                  PO Box 2618
                    Covington, KY  41012-2618
11                  859.392.8662
                    859.291.9300 Fax
12                  Dfutscher@pdfslaw.com

13

14
    For the Defendants:
15
                    Cari K. Dawson
16                  Alston & Bird
                    1201 West Peachtree Street
17                  Atlanta, GA  30309-3424
                    404.881.7000
18                  404.253.8567 Fax
                    Cari.dawson@alston.com
19

20

21

22 Also present:  Cody Malone

23

24

25
```

792d93f9-edb4-4096-ab13-27bcc522c783

Page 5

1        We would ask that the attorneys present identify

2    themselves now for the record.

3                    MR. FUTSCHER:  David Futscher and

4    Van Bunch on behalf of the plaintiffs in the case.

5                    MS. DAWSON:  Cari Dawson on behalf

6    of Defendant Safeco Insurance Company of Illinois.

7                    VIDEOGRAPHER:  Thank you.

8        The court reporter today is Terilynn Pritchard.

9    If you would please swear in the witness and proceed

10   with the deposition.

11

12   MICHAEL G. STAVE,        having been first duly sworn

13                            by the Notary, deposed and

14                            testified as follows:

15

16

17                    MS. DAWSON:  Before we get started,

18   can we go ahead and simply do what we did yesterday in

19   terms of this particular witness and the fact that you

20   all noticed him for a 30(b)(6) and we've designated

21   him to testify regarding Category No. 1 for the states

22   that he will specify in the course of his deposition?

23       You've also noticed him in his individual

24   capacity.

25       We could not come to an agreement regarding the

792d93f9-edb4-4096-ab13-27bcc522c783

Page 37

1 Q   And do you recall why it was that you and Mr. Rollins

2     decided to designate Mr. Fromm as the designated DV

3     handler for the state of Washington?

4 A   There's lots of factors that go into that answer.

5     Part of it but not limited to would be his ability

6     with customers.  He's very good with customer service.

7     He's organized.  He's thorough.  He had experience in

8     doing his job, was competent at it.

9 Q   Did he have any experience with diminished value, to

10     your knowledge?

11 A   I don't know.

12 Q   Was Mr. Fromm required to undergo any special training

13     to be the DV handler for the state of Washington?

14 A   Mr. Fromm was instructed on numerous occasions on the

15     way to handle a diminished value claim.

16         I'm not quite sure what you mean by "special

17     training."

18         Maybe you could define that a little bit more for

19     me.

20 Q   I will.  Just a second.

21         Now, with respect to special training, I was

22     trying to identify maybe any training that he would

23     have gone to, formal training--

24 A   Sure.

25 Q   --in addition to what a typical field examiner would

792d93f9-edb4-4096-ab13-27bcc522c783

Page 38

```
 1    go to, specifically related to diminished value.

 2 A  Sure.

 3       I'm not aware of any special training in the

 4    industry for diminished value.

 5 Q  Okay.

 6 A  At the time I certainly wasn't aware of any, so--

 7 Q  So the answer to that would be no, that you're aware

 8    of, correct?

 9                    MS. DAWSON:  Object to the form of

10    the question.

11                    THE WITNESS:  That's a supposition

12    on your part.  I'm just explaining I'm not aware of

13    any special training.

14 Q  (By Mr. Futscher)  Right.  Well, the answer to my

15    question-- you asked me to define special training.

16 A  Right.

17 Q  And I defined it as some additional training he would

18    have to go to as an adjuster, a formal training class

19    on diminished value.

20       You were not aware of that type of training,

21    correct?

22 A  Correct.

23 Q  So you are not aware that he went to any type of

24    training like that, correct?

25 A  I'm not aware.
```

792d93f9-edb4-4096-ab13-27bcc522c783